# EXHIBIT G-6

# Gordon Brothers Group
#### EST. 1903

February 22, 2016

North Mill Capital LLC
821 Alexander Road
Suite 130
Princeton, NJ 08540

Re: Wilton Armetale

Dear Ms. Hernandez:

The purpose of this letter is to express the interest of Gordon Brothers Commercial & Industrial
LLC ("GBCI") to enter into a definitive Asset Purchase Agreement with Wilton Armetale (the
"Company") or the Secured Lender to purchase the Inventory, Machinery & Equipment,
Accounts Receivable and Intellectual Property of the Company (the "Assets") pursuant to a
mutually agreeable structure by all parties.

On terms and conditions more fully set forth in a definitive Asset Purchase Agreement GBCI
would purchase all of Company's right, title and interest in and to all of the following Assets of
the Company.

I.   all Intellectual Property of Sellers including, without limitation all Trademarks,
     Patents, Molds, Customer Lists, Domain Names and Designs, the Intellectual
     Property.
II.  all inventory, supplies, finished goods, work in process, packaging materials and
     other consumables of Company as set forth on Exhibit A.
III. all Accounts Receivable and Intercompany Receivables, without limitation, the
     Accounts Receivable set for on Exhibit B.
IV.  all computer systems, computer hardware, machinery, vehicles, tools, equipment,
     furnishings, office equipment, fixtures, furniture, and other fixed Assets which are
     owned by Company.

Based on the information and due diligence provided to date, GBCI would purchase the Assets
for $725,000. The purchase price would not be subject to any financing contingency or
additional due diligence and would be paid in immediately available funds at closing.

The foregoing is subject only to legal documentation for a transaction of this nature. We would
expect to take approximately 3 business days to complete negotiation of a definitive agreement
with the cooperation of all parties in terms of the legal documentation.

Any definitive purchase would be subject to the following additional terms and conditions:

i.   All Assets being free and clear of liens and claims, but understanding that
     the Assets will be sold "as is where is" with limited representations or

warranties, written or implied, but including free, clear and marketable title for all licensed and non-licensed inventory.

ii.   Obtaining required consents under law or contract necessary to consummate the transactions contemplated by this letter.

iii.   Peaceful Use & Occupancy of the warehouse locations for up to 60 days and Corporate Office/Retail location for up to 30 days.

iv.   The foregoing is based upon the Assets being of the same levels, quality and condition as reflected in the attached Exhibits.

v.   Mutually agreeable documents that include usual terms, conditions, covenants, indemnities, remedy schedules and representations customarily contained in documents for similar transactions, subject to final approval and execution by all parties.

We look forward to your response to this letter and its basic conditions, so that we can move forward with negotiation of a definitive agreement as soon as is practical. The terms and conditions of this offer are subject to the mutual Confidentiality Agreement. This offer shall expire on February 25, 2016 at 5:00 pm Eastern Standard Time.

Very truly yours,

On Behalf of Gordon Brothers Commercial & Industrial, LLC

By: _____
       Jim Lightburn

CC: Robert Maroney
       Ulos Anderson

2

# EXHIBIT G-7

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into as of March 7 , 2016, by and between Wilton Armetale, Inc., a Pennsylvania corporation (the "**Seller**") and Gordon Brothers Commercial & Industrial, LLC, a Delaware limited liability company (the "**Purchaser**").

### Introduction

The Purchaser wishes to purchase from the Seller, and the Seller desires to sell to the Purchaser, substantially all of the inventory, accounts receivable, intellectual property, furniture, fixtures, machinery and equipment and fixed assets of the Seller.  The purchase and sale of the assets and the other transactions contemplated hereby are sometimes collectively referred to herein as the "**Transactions**."

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## THE TRANSACTIONS; CLOSING

**1.1.**    **Purchase and Sale of Purchased Assets**.  Subject to the terms and conditions of this Agreement, and in reliance upon the representations and warranties contained herein, at the Closing, the Purchaser shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Purchaser, free and clear of all liens, security interests, mortgages, encumbrances and restrictions of every kind (collectively, "**Liens**"), all of the following (collectively, the "**Purchased Assets**"):

(a)    all Intellectual Property of the Seller, including without limitation, all trademarks, patents, molds, customer lists, domain names and designs whether or not set forth on **Schedule 1.1(a)**;

(b)    all inventory, supplies, finished goods, work in process, packaging materials and other consumables of Seller including without limitation as set forth on **Schedule 1.1(b)**;

(c)    all accounts receivable, without limitation, the accounts receivable set forth on **Schedule 1.1(c)**;

(d)    all computer systems, computer hardware (including any data thereon that is relevant to the Business), machinery, vehicles, tools, equipment, furnishings, office equipment, fixtures, furniture, and other fixed assets that are owned by the Seller including, without limitation, the furniture, fixtures and equipment and other fixed assets set forth on **Schedule 1.1(d)**;

7304972v5

(e)   the licenses, permits, authorizations, franchises and certifications of governmental and non-governmental authorities held by the Seller that are related to the furniture, fixtures and equipment included in the Purchased Assets, as set forth on **Schedule 1.1(e)** (the "**Permits**");

(f)   all manuals, instructions and other materials related to the furniture, fixture, machinery and equipment included in the Purchased Assets;

(g)   the bank accounts set forth on **Schedule 1.1(g)**; and

(h)   all goodwill associated with the Purchased Assets.

**1.2.    Excluded Assets**. Notwithstanding the foregoing, the Purchased Assets shall not include the assets of the Company listed on **Schedule 1.2** attached hereto, which Purchaser shall be leave at the applicable Properties and Seller may dispose of and retain the proceeds therefrom.

**1.3.    Nominees**. Purchaser shall have the right, exercisable on or before the Closing Date, to require the Seller, on the Closing Date, to transfer title to any of the Purchased Assets to third party nominees of the Purchaser. The Purchaser may designate different nominees for the various Purchased Assets to be purchased in the aggregate by the Purchaser and/or such nominees.

**1.4.    Excluded Liabilities.** The Purchaser shall not assume or in any way be responsible for any obligations or liabilities of the Seller (whether or not disclosed) of any kind. Without limiting the generality of the foregoing, the Purchaser will not assume: (a) any Taxes of Seller or any of its Affiliates; (b) any liability relating to any benefit plans, employees or contractors of the Seller or any of its Affiliates; (c) any obligation of the Seller under this Agreement or any other agreement, document or instrument entered into by the Seller pursuant to this Agreement; (d) any obligation of the Seller incurred in connection with the Transactions, including all amounts in respect of legal, investment banking, financial advisor, broker and other similar fees, costs, expenses and obligations; (e) any Indebtedness; (f) any liability arising out of any action, arbitration, claim, proceeding or litigation of any nature (whether or not disclosed) against the Seller, or relating to the operation of the Business; (g) any liability arising out of the Seller's violation of any Legal Requirement; (h) any liability arising under agreement, contract, lease or other commitment of Seller, whether written or oral, and any liability arising out of the failure of the Seller to comply with any such agreement, contract, lease or other commitment; or (i) any liability to any stockholder of the Seller or to any Affiliate of the Seller. The liabilities and obligations of the Seller, which shall remain the obligation and responsibility of the Seller following the Closing, are collectively referred to as the "**Excluded Liabilities**." The Seller will discharge when due all of the Excluded Liabilities.

**1.5.    Certain Definitions**. For purposes of this Agreement, the following terms shall have the meanings indicated below:

"**AR Shortfall**" means (a) the amount, if any, by which the accounts receivable of the Company as of the date immediately prior to the Closing (as agreed to in good faith by the parties on such date) is less than the accounts receivable of the Company set

2

7304972v5

**Confidential—Subject To December 19, 2016
Limited Use/Non-Disclosure Agreement**

forth Exhibit A attached hereto, which includes a list of the Company's accounts receivable as of February 26, 2016, *multiplied by* (b) 68%.

"**Affiliate**" has the meaning ascribed to it in Rule 405 promulgated under the Securities Act of 1933, as amended.

"**Indebtedness**" means all principal, interest, fees, expenses and other amounts in respect of borrowed money, notes, bonds, debentures and other debt securities, guarantees, interest rate, currency or other hedging arrangements, capital leases, letters of credit and/or installment purchases incurred by the Seller or any of its Affiliates, or required to be paid in order to discharge fully all such amounts.

"**Intellectual Property**" shall mean all intellectual property rights of every kind of Seller including all (i) patents, patent applications, patent disclosures and inventions, (ii) trademarks, service marks, trade dress, trade names, logos and corporate names (in each case, whether registered or unregistered) and registrations and applications for registration thereof, (iii) copyrights (registered or unregistered) and registrations and applications for registration thereof, (iv) computer software, data, data bases and documentation thereof, (v) trade secrets and other confidential or proprietary information (including, without limitation, ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, research and development information, drawings, specifications, designs, plans, proposals, molds, technical data, copyrightable works, financial and marketing plans and customer and supplier lists and information, (vi) World Wide Web addresses and domain name registrations, (vii) works of authorship including, without limitation, computer programs, source code and executable code, whether embodied in software, firmware or otherwise, documentation, designs, files, records, data and mask works and any rights in semiconductor masks, layouts, architectures or topography, and (viii) goodwill associated with any of the foregoing. The Seller's patents, trademarks and copyrights registered with the United States Patent and Trademark Office and the Borrower's registered domain names are set forth on **Schedule 2.6** attached hereto and incorporated herein.

"**Inventory Shortfall**" means (a) the amount, if any, by which the cost value of the inventory of the Company as of the date immediately prior to the Closing (as agreed to in good faith by the parties on such date) is less than the cost value of the inventory of the Company as set forth on Exhibit B attached hereto, which sets forth the inventory as of February 26, 2016, *multiplied by* (b) 45%.[3]

"**Legal Requirements**" means, with respect to any Person, all foreign, federal, state and local statutes, laws, ordinances, judgments, decrees, orders, rules, regulations, policies and guidelines applicable to such Person.

"**Permitted Liens**" means (i) prior to the Closing, the Liens designated as such on **Schedule 1.5(a)**, (ii) statutory Liens for current Taxes or assessments not yet due and payable and (iii) such other Liens, imperfections in title and easements of record, if any, that do not detract, individually or in the aggregate, from the value of or interfere with the present or proposed use by the Seller of the property subject thereto or affected thereby.

7304972v5

Confidential—Subject To December 19, 2016
Limited Use/Non-Disclosure Agreement                                        GB_001128

"**Permitted Use**" means the storage, maintenance, marketing, sale (including by way of public auction), packing and shipping of the Purchased Assets.

"**Person**" means any natural person or corporation, limited liability company, partnership, trust, other business entity, governmental authority or non-governmental authority.

"**Properties**" means the real property and all improvements thereto owned or leased by the Seller and located at the following addresses: (i) 855 Stony Battery Road, Township of East Hempfield, PA 17538 (the "**Warehouse Property**") and (ii) each of 903 and 919 Square Street, Mount Joy, PA 17552 (the "**Office and Retail Properties**").

"**Purchase Price**" means the sum of (i) $725,000, *minus* (ii) the amount, if any by which the AR Shortfall and Inventory Shortfall together exceed $50,000.

"**Tax**" or "**Taxes**" means all taxes, charges, fees, levies, penalties, additions or other assessments imposed by any foreign, federal, state or local taxing authority, including, but not limited to, income, excise, property, sales, use, transfer, franchise, payroll, withholding, value added, social security or other taxes, charges or assessments, including any interest, penalties or additions attributable thereto.

"**Tax Returns**" means all reports, estimates, declarations of estimated Tax, information statements and returns relating to, or required to be filed in connection with, any Taxes and any schedules attached to or amendments of (including refund claims with respect to) any of the foregoing.

**1.6.    Closing.** The Transactions contemplated hereby shall take place at a closing (the "**Closing**") to be held remotely by the electronic exchange of documents and signatures (or at such location as the parties may designate in writing) on the date hereof (the "**Closing Date**").

**1.7.    Allocation.** The total amount of the Purchase Price shall be allocated among the assets of the Seller for Tax purposes in a manner consistent with the allocations determined in good faith by the Purchaser within 90 days following the Closing. It is agreed that the allocations under this Section 1.7 will be binding on all parties for federal, state, local and other Tax purposes and will be consistently reflected by each party on such party's Tax Returns.

## ARTICLE 2
### REPRESENTATIONS AND WARRANTIES CONCERNING THE SELLER

The Seller represents and warrants to the Purchaser that the information contained in this Article 2 is true and correct and will be true and correct as of the Closing Date:

**2.1.    Organization, Power and Standing.** The Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania, and has all requisite power and authority to own, lease and operate its properties and to carry on its business as historically conducted (collectively, the "**Business**"). The Seller is duly qualified and authorized to do business and is in good standing in each jurisdiction where it is required to qualify to do business as a foreign entity, except where the failure to do

4

7304972v5

so would not have or be reasonably expected to have a material adverse effect on the Purchased Assets.

**2.2.     Due Authorization; No-Conflict.**  The Seller has full power and authority and has taken all required action on its part (including board and stockholder approval) necessary to permit it to execute and deliver and to carry out the terms of this Agreement and the other agreements, instruments and documents of the Seller contemplated hereby.  Except as specified on **Schedule 2.3**, no consent, order, authorization, approval, declaration or filing with any Person, is required on the part of the Seller for or in connection with its execution, delivery or performance of this Agreement or any of the other agreements, documents and instruments contemplated hereby (the "**Required Consents**").  Subject to obtaining the Required Consents specified on **Schedule 2.3**, the execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Seller will not result in any violation of, be in conflict with, constitute a default under, or cause the acceleration of any obligation or loss of any rights under, any Legal Requirement or agreement, contract, instrument, charter, by-laws, organizational document or Permit to which the Seller is a party or by which the Seller is bound.

**2.3.     Validity and Enforceability.**  This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Seller is a party shall be when executed and delivered by the Seller, the valid and binding obligations of the Seller enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

**2.4.     Contracts.**  There are no contracts, agreements or arrangement, whether written or oral, to which the Seller is party and related to the Purchased Assets that are necessary for the Purchaser to own and operate the Purchased Assets following the Closing.

**2.5.     Real Property.**  The Seller has good title to or a valid leasehold interest in the Properties, free and clear of all Liens, except for Permitted Liens, and enjoys peaceful and quiet possession of the Properties.  The Properties are in compliance in all material respects with all applicable Legal Requirements.  With respect to each of the Properties leased by the Seller, the Seller is party to a written lease agreement (the "**Leases**") that is valid, binding and in full force and effect.  Each of the Leases entitles the Seller to occupy such leased Property for a period of time at least equal to the Post-Closing Period.  The Seller is in compliance with the terms of each of the Lease and is current in all of its financial obligations under each of the Leases.  In respect of each Lease, **Schedule 2.5** sets forth the amount owed by the Seller for the duration of the Post-Closing Period.

**2.6.     Intellectual Property.  Schedule 2.6** sets forth a complete and accurate list of the Seller's registered Intellectual Property and a description of any other material Intellectual Property owned or used by the Seller.

**2.7.     Condition of Purchased Assets.**  The condition and status of the Purchased Assets is unchanged from how such assets appeared during the inspection conducted on Purchaser's behalf on February 22, 2016.  Exhibit A attached hereto sets forth a complete and

7304972v5

5

GB_001130

accurate list of the accounts receivable of the Company as of February 26, 2016 and Exhibit B attached hereto sets forth a complete and accurate list of the inventory of the Company as of February 26, 2016. At the Closing, the Purchaser will acquire from the Seller good and marketable title to the Purchased Assets, free and clear of all Liens.

    **2.8.** **Regulatory and Legal Compliance.** The Seller is in compliance in all material respects with all Legal Requirements. Since January 1, 2013, the Seller has not received any notice from any governmental authority or any other Person of any alleged violation or non-compliance with any Legal Requirement.

    **2.9.** **Permits**. The Seller is in compliance in all material respects with all of the Permits, all of which are in full force and effect and will be in full force and effect and held by the Purchaser immediately after giving effect to the Transactions. The Seller does not know of any threatened suspension, revocation or invalidation of any such Permits, or any basis therefor.

    **2.10.** **Litigation.** Except as set forth in **Schedule 2.10**, no action, arbitration, suit, proceeding or investigation is pending or, to the knowledge of the Seller, threatened against the Seller, to the knowledge of the Seller, against any equity holder, member, officer, director, manager or employee of the Seller in relation to the Purchased Assets.

    **2.11.** **Environmental**. There is and will be no liability attaching to the Purchaser or the Purchased Assets as a result of any hazardous substance that may have been discharged on or released from any premises owned or operated by the Seller (including any predecessors or subsidiaries) or in connection with the Seller's business or the Purchased Assets, or disposed of on-site or off-site, or any other circumstance occurring prior to the Closing or existing as of the Closing. The Seller does not store, maintain or have any hazardous substances on any of the Properties. For purposes of this Section, "hazardous substance" shall mean oil or any other substance which is included within the definition of a "hazardous substance," "pollutant," "toxic substance," "toxic waste," "hazardous waste," "contaminant" or other words of similar import in any foreign, federal, state or local environmental Legal Requirement.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

    The Purchaser represents and warrants to the Seller that each of the statements contained in this Article 3 is true and correct and will be true and correct as of the Closing Date:

    **3.1.** **Authority.** The Purchaser has full power and authority and has taken all required action on its part (including board and member approval) necessary to permit it to execute and deliver and to carry out the terms of this Agreement and the other agreements, instruments and documents of the Purchaser contemplated hereby.

    **3.2.** **No Conflict**. No consent, approval or authorization of or declaration or filing with any governmental or non-governmental authority or any party to any contact with the Purchaser is required on the part of the Purchaser for or in connection with its execution, delivery or performance of this Agreement and the other agreements, documents and instruments contemplated hereby. The execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Purchaser

6

7304972v5

will not result in any violation of, be in conflict with, or constitute a default under any Legal Requirement, agreement, contract, instrument, charter, by-laws, operating agreement, partnership agreement, organizational document, Permit to which the Purchaser is a party or by which the Purchaser is bound.

**3.3.     Validity and Enforceability.** This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Purchaser is a party shall be when executed and delivered by the Purchaser, the valid and binding obligations of the Purchaser enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

## ARTICLE 4
## SELLER'S POST-CLOSING COVENANTS

**4.1.     Permitted Use of the Properties.** The Seller hereby grants to the Purchaser, in common with the Seller and any other party to whom the Seller grants a right to occupy, enter or use the Properties, for a period of up to (a) thirty days following the Closing Date with respect to the Office and Retail Properties and (b) sixty days following the Closing Date with respect to the Warehouse Property ((a) and (b), as applicable, the "**Post-Closing Period**"), a royalty-free license to enter, occupy and use, solely in connection with the Permitted Use, the portion of the Properties in which the Purchased Assets are located, such license also to include a right to enter, occupy and use the driveways, parking facilities, forklifts and other loading equipment, loading dock areas and similar improvements associated with the Properties. The entry into and the occupation and use of the Properties by the Purchaser and/or its personnel shall be at the Purchaser's sole risk and expense.

### 4.2.     Maintenance of Insurance and Utilities.

(a)     During the Post-Closing Period, the Seller shall:

(i)     maintain such insurance in such amounts as is required under the terms of each Lease;

(ii)     at no cost to the Purchaser, maintain power, heat, water, gas and all other required utilities to the Properties so as to preserve the condition and functionality of the Purchased Assets and to facilitate the marketing, sale and removal of the Purchased Assets from the Properties;

(iii)     at no cost to the Purchaser, maintain the building security measures with respect to each of the Properties as set forth on **Schedule 4.2(c)**, which shall include, without limitation, the changing of the locks on each of the Properties on or immediately after the Closing Date, so as to provide for the safety and security of the Purchased Assets located within the Properties;

(iv)     directly, or by requiring the lessor of any leased Property to do so, (i) maintain the Properties in good order and condition at all times during the applicable Post-Closing Period, such actions to include reasonable replacement, restoration and

7

7304972v5

GB_001132

renewal, as necessary, of and for the Properties and (ii) repair or replace any damage to the Properties such that any damaged Property is returned to the condition of such Property as of the Closing Date;

      **(v)**    maintain in effect and comply with the terms of each of the Leases; and

      **(vi)**    pay all Taxes and other amounts due and owing in respect of the owned Properties.

    **(b)**    During the Post-Closing Period, the Purchaser shall:

      **(i)**    maintain general liability insurance of at least $2,000,000 and name the Seller as an additional insured;

      **(ii)**    keep the Office and Retail Properties and Warehouse Property free of material debris and in the same condition as of the Closing Date, normal wear and tear excepted;

      **(iii)**    refrain from causing any material damage to the Office and Retail Properties and Warehouse Property, normal wear and tear excepted; and

      **(iv)**    at its option, either repair, cause to be repaired or pay to the Seller the reasonable repair costs for, any damage to the Properties caused by negligence or willful misconduct of the Purchaser or any of its agents, employees, representatives, contractors or invitees.

    **4.3.**    **On-Site Transition Assistance.**  Following the Closing, the Purchaser shall be permitted to hire employees or former employees of the Seller at its own cost and expense, for the purpose of assisting the Purchaser with disposing of the Purchased Assets and such other purposes that the Purchaser may reasonably request.

    **4.4.**    **Use of Name.**  The Seller acknowledges and agrees that the names "Wilton Armetale" and any abbreviations or derivations thereof, constitute part of the Purchased Assets and shall refrain from using any such names, abbreviations or derivations after the Closing. Within five (5) business days after the Closing, the Seller shall change its legal name to a name that is not confusingly similar to such name.

    **4.5.**    **Sweep Agreements.**  Within five (5) business days after the Closing, the Seller shall cause each of its back end and/or control sweep agreements to be transferred or assigned to the Purchaser or its designee.

    **4.6.**    **Receipt of Payments; Outstanding Checks.**  Notwithstanding anything in Section 4.5, from and after the Closing:

    **(a)**    Other than payments made by or on behalf of Purchaser in connection with this Agreement, in the event that the Seller or any of its Affiliates shall receive any

8

7304972v5

payments with respect to the Purchased Assets after the Closing that are (or should be) the property of the Purchaser, including any payments of any accounts receivable, such payments shall be held in trust for Purchaser and delivered to the Purchaser within three business days thereafter.

      **(b)**     The Seller shall cause all checks, bank drafts, money orders and similar instruments issued by the Seller at any time prior to and including the Closing to be honored and paid in full, and the Seller shall maintain a sufficient amount of cash in all bank and other depository accounts of the Seller on which such instruments are drawn to cover the amount of all such obligations outstanding as of the Closing.

      **(c)**     In the event that the Seller or any of its Affiliates shall receive any communications or correspondence pertaining to the Purchased Assets, the Seller shall, and will cause its Affiliates to, within three business days after receipt thereof, forward such communications or correspondence to the Purchaser.

### ARTICLE 5
### CLOSING DELIVERABLES; PURCHASE PRICE

    **5.1.**    **Seller Closing Deliverables.**  Unless waived in writing by the Purchaser, at or prior to the Closing, the Seller shall deliver the following to the Purchaser:

      **(a)**     **Required Consents Received.**  The Seller shall have obtained and delivered to the Purchaser copies of all Required Consents listed on or required to be listed on **Schedule 2.3**, and no such Required Consents shall have been withdrawn, suspended or conditioned.

      **(b)**     **Lien Releases.**  The Seller shall have delivered to the Purchaser a limited consent of and release of liens by North Mill Capital, LLC ("**NMC**"), in a form reasonably acceptable to the Purchaser, which consent and release provides for the release of all Liens held by NMC on the Purchased Assets, including the registered Intellectual Property of the Seller.

      **(c)**     **Instrument of Transfer.**  The Seller shall have executed and delivered to the Purchaser (i) a Bill of Sale and Assignment and Assumption Agreement, in a form reasonably acceptable to the Purchaser (the "**Bill of Sale and Assignment and Assumption Agreement**") and (ii) a Trademark Assignment Agreement in a form reasonably acceptable to the Purchaser, collectively reflecting the Seller's transfer of the Purchased Assets to the Purchaser free and clear of all Liens.

      **(d)**     **Certificate of Assets.**  The Seller shall have delivered to the Purchaser confirmation that there has been no material change in the Company's inventory or accounts receivable since the date prior to the Closing..

      **(e)**     **No Injunction.**  The consummation of the Transactions contemplated hereby shall not violate any order, decree or judgment of any court or governmental body having competent jurisdiction.

9

7304972v5

**Confidential—Subject To December 19, 2016**
**Limited Use/Non-Disclosure Agreement**

**(f)    Certificates; Documents.** The Purchaser shall have received copies of each of the following for the Seller certified to its satisfaction by an officer of the Seller: (i) the Seller's certificate of incorporation, as amended, certified by the Pennsylvania Department of State as of a recent date; (ii) a copy of the Seller's bylaws, as amended and in effect as of the Closing Date; (iii) a certificate of the Pennsylvania Department of State as of a recent date as to the legal existence and good standing of the Seller; and (iv) resolutions adopted by the stockholders and directors of the Seller authorizing the execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby and the consummation of the Transactions. The Purchaser shall also have received such other certificates, documents and materials as it shall reasonably request.

**(g)    Non-Foreign Affidavit.** The Seller shall have delivered to the Purchaser a statement satisfying the requirements of Treas. Reg. §1.1445-2(b)(2).

**5.2.    Purchaser Closing Deliverables.** Unless waived in writing by the Seller, at or prior to the Closing, the Purchaser shall deliver the following to the Seller:

**(a)    Payment of Purchase Price.** At the Closing, the Purchaser will pay (or cause to be paid) the Purchase Price to the Seller by wire transfer of immediately available funds pursuant to the wire instructions attached hereto as **Exhibit 5.2(a)**.

**(b)    Instruments of Transfer.** The Purchaser shall have executed and delivered to the Seller the Bill of Sale and Assignment and Assumption Agreement, reflecting the Purchaser's acquisition of the Purchased Assets.

## ARTICLE 6
## SURVIVAL; INDEMNIFICATION

**6.1.    Survival.** The representations, warranties, covenants and agreements contained herein shall survive the Closing and any investigation or finding made by or on behalf of the Purchaser or the Seller. No action for a breach of the representations and warranties contained herein shall be brought more than twelve months following the Closing Date, except for claims of which the Seller has been notified with reasonable specificity by the Purchaser, or claims of which the Purchaser has been notified with reasonable specificity by the Seller, within such period, which shall survive until such claims have been resolved.

**6.2.    Indemnification by the Seller.** The Seller shall indemnify and hold the Purchaser and its Affiliates harmless from and against all claims, liabilities, obligations, costs, damages, losses and expenses (including reasonable attorneys' fees and costs of investigation) of any nature (collectively, "**Losses**") arising out of or relating to (i) any breach or violation of the representations or warranties of the Seller set forth in this Agreement (including the schedules) or in any certificate or document delivered pursuant to this Agreement, (ii) any breach or violation of the covenants or agreements of the Seller set forth in this Agreement, (iii) the Excluded Liabilities, (iv) any violation of any bulk sales laws as a result of the consummation of the Transactions or (v) any fraud, intentional misrepresentation or willful misconduct.

10

7304972v5

**Confidential—Subject To December 19, 2016
Limited Use/Non-Disclosure Agreement**

**6.3.    Indemnification by the Purchaser.**  The Purchaser shall indemnify and hold the Seller harmless from and against all Losses arising out of or relating to any breach or violation of the representations, warranties, covenants or agreements of the Purchaser set forth in this Agreement.

**6.4.    Right of Set-Off.**  If the Seller has not satisfied in cash any indemnification obligation owed by it hereunder, the Purchaser or any of its Affiliates may, at their discretion, satisfy the unpaid portion of such obligation by, to the extent permitted by law, setting-off against any amounts that may be due and owing from the Purchaser or any of its Affiliates to the Seller or any of its Affiliates.

**6.5.    Adjustment to Purchase Price.**  All indemnification payments paid pursuant to this Article shall be adjustments to the purchase price.

**ARTICLE 7**
**MISCELLANEOUS**

**7.1.    Notices.**  All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by e-mail or fax, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered:

**(a)**    if to the Seller, to:

c/o Wilton Armetale, Inc.
PO Box 600
Mt. Joy, PA 17552
Attention:  Ivan L. Jeffery and Ed Leibensperger
E-mail:  ivanj@crescentco.com
E-mail:  eleibensperg@armetale.com

with a copy (which shall not constitute notice) to:

LEISAWITZ HELLER
2755 Century Boulevard
Wyomissing, PA 19610
Attention:  Charles J. Phillips, Esquire
Fax:  (610) 372-8671
cphillips@leisawitzheller.com

**(b)**    if to the Purchaser, to:

Gordon Brothers Commercial & Industrial, LLC
101 Huntington Avenue, 10th Floor
Boston, MA 02199
Attention:  Jim Lightburn
Email:  jlightburn@gordonbrothers.com

11

7304972v5

**Confidential—Subject To December 19, 2016**
**Limited Use/Non-Disclosure Agreement**

GB_001136

with a copy (which shall not constitute notice) to:

Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
Attention: Kevin J. Simard
Fax: (617) 248-4000
E-mail: ksimard@choate.com

or at such other address as may have been furnished by such person in writing to the other
parties. Any such notice, demand or communication shall be deemed given on the date given, if
delivered in person, e-mailed or faxed or otherwise actually delivered, on the date received, if
given by registered or certified mail, return receipt requested or given by overnight delivery
service, or three days after the date mailed, if otherwise given by first class mail, postage
prepaid.

    **7.2.**    **Governing Law; Forum.** This Agreement shall be governed by and construed in
accordance with the internal laws of the Commonwealth of Massachusetts applicable to
agreements executed and to be performed solely within such State. Any judicial proceeding
arising out of or relating to this Agreement shall be brought in the courts of the Commonwealth
of Massachusetts, and, by execution and delivery of this Agreement, each of the parties to this
Agreement accepts the exclusive jurisdiction of such courts, and irrevocably agrees to be bound
by any judgment rendered thereby in connection with this Agreement. Each of the parties
further agrees that a summons and complaint commencing an action or proceeding in any of
such courts shall be properly served and shall confer personal jurisdiction if served to it at the
address and in the manner set forth in Section 7.1 or as otherwise provided under the laws of the
Commonwealth of Massachusetts. This provision may be filed with any court as written
evidence of the knowing and voluntary irrevocable agreement between the parties to waive any
objections to jurisdiction, to venue or to convenience of forum. The foregoing consents to
jurisdiction and appointments of agents to receive service of process shall not constitute general
consents to service of process in the Commonwealth of Massachusetts for any purpose except as
provided above and shall not be deemed to confer rights on any Person other than the respective
parties to this Agreement.

    **7.3.**    **Amendments, Waivers.** This Agreement may be amended or modified only with
the written consent of the Purchaser and the Seller. No waiver of any term or provision hereof
shall be effective unless in writing signed by the party waiving such term or provision. No
failure to exercise or delay in exercising any right, power or remedy hereunder shall operate as a
waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder
preclude any other or further exercise thereof or the exercise of any other right, power or
remedy. The rights provided hereunder are cumulative and not exclusive of any rights, powers
or remedies provided by law.

    **7.4.**    **Expenses.** Except as otherwise expressly set forth herein, all legal and other costs
and expenses incurred in connection with this Agreement and the Transactions contemplated
hereby shall be paid by the party incurring such costs and expenses.

7304972v5

**Confidential—Subject To December 19, 2016**
**Limited Use/Non-Disclosure Agreement**

GB_001137

**7.5.** **Successors and Assigns.** This Agreement, and all provisions hereof, shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, <u>provided</u> that this Agreement may not be assigned by any party without the prior written consent of the other parties hereto except that (a) the rights hereunder of the Purchaser may be assigned to any bank or other financial institution that is or becomes a lender to the Purchaser or any of its subsidiaries, and (b) this Agreement may be assigned by the Purchaser to any of its Affiliates or to any Person acquiring a material portion of the assets, business or securities of the Purchaser, whether by merger, consolidation, sale of assets or securities or otherwise.

**7.6.** **Entire Agreement.** This Agreement, the attached exhibits and schedules, and the other agreements, documents and instruments contemplated hereby contain the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof unless expressly referred to herein.

**7.7.** **Counterparts.** This Agreement may be executed in one or more counterparts, and with counterpart facsimile or electronically scanned signature pages, each of which shall be an original, but all of which when taken together shall constitute one and the same Agreement.

**7.8.** **Headings.** The headings of Articles and Sections herein are inserted for convenience of reference only and shall be ignored in the construction or interpretation hereof.

**7.9.** **Further Assurances.** Following the Closing, the parties will execute and deliver such documents and take such other actions as may be reasonably requested from time to time by the Purchaser or the Seller in order to fully consummate the Transactions.

**7.10.** **Third Party Beneficiaries.** Nothing in the Agreement shall be construed to confer any right, benefit or remedy upon any Person that is not a party hereto or a permitted assignee of a party hereto, except as otherwise expressly set forth in this Agreement.

**7.11.** **No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the other agreements and documents contemplated herein. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement or any other agreement or documents contemplated herein, this Agreement and such other agreements or documents shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement or any other agreements or documents contemplated herein.

**7.12.** **Publicity.** Seller may not issue a press release or make other public announcements concerning the Transactions contemplated by this Agreement without the prior consent of the Purchaser. Following the Closing, the Seller shall not, directly or indirectly, disclose, divulge or make use of any trade secrets or other information of a business, financial, marketing, technical or other nature pertaining to the Purchaser, the Company, or the business of the Company, including information of others that the Purchaser or the Company has agreed to keep confidential and the terms and conditions of this Agreement, except (a) to the extent that such information shall have become public knowledge other than by breach of this Agreement

13

7304972v5

**Confidential—Subject To December 19, 2016**
**Limited Use/Non-Disclosure Agreement**

GB_001138

by the Seller, (b) to the extent Seller is required to disclose such information in order to comply with its obligations hereunder and (c) to the extent that disclosure of such information is required by law or legal process (but only after the Seller has provided the Purchaser with reasonable notice and opportunity to take action against any legally required disclosure).

**7.13.** **Schedules and Exhibits.** All schedules and exhibits to this Agreement are an integral part of this Agreement and are incorporated herein by reference in this Agreement for all purposes of this Agreement. All schedules and exhibits delivered with this Agreement shall be arranged to correspond with the numbered and lettered sections and subsections contained in this Agreement, and the disclosures in such schedules shall qualify only the corresponding sections and subsections contained in this Agreement, unless otherwise expressly provided herein.

**7.14.** **Waiver of Jury Trial.** EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**7.15.** **Severability.** This Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provisions shall be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

**7.16.** **Certain Taxes.** All transfer, documentary, sales, use, real property gains, stamp, registration, and other such Taxes and fees incurred in connection with this Agreement shall be paid by the Seller when due, and the Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, real property gains, stamp, registration, and other Taxes and fees, and, if required by applicable law, the Purchaser will join in the execution of any such Tax Returns and other documentation.

*[Signature page follows.]*

14

7304972v5

Confidential—Subject To December 19, 2016
Limited Use/Non-Disclosure Agreement

GB_001139

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as a sealed instrument as of the date first above written.

SELLER:

WILTON ARMETALE, INC.

By: _____

Name: $\mathcal{F} \angle \mathcal{A} \mathcal{N}$  $Z$. $\mathcal{J} + \mathcal{H} \mathcal{O} \cup$

Title:  $C. F. O.$

PURCHASER:

GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC

By: _____

Name:

Title:

[Signature Page to Asset Purchase Agreement]

7304972v5

Confidential—Subject To December 19, 2016
Limited Use/Non-Disclosure Agreement

GB_001140

IN WITNESS WHEREOF, the parties hereto have executed and delivered this
Agreement as a sealed instrument as of the date first above written.

SELLER:

WILTON ARMETALE, INC.

By: _____
Name:
Title:

PURCHASER:

GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC

By: _____
Name: Jim Lightburn
Title: Managing Director

[Signature Page to Asset Purchase Agreement]

7304972v5

Confidential—Subject To December 19, 2016
Limited Use/Non-Disclosure Agreement

GB_001141

# EXHIBIT G-8

Payment Details - 1637B2011LDI1328

Print        Email        Export

Domestic High Value (Wire)
Payment Category:   UrgentWire
Status:   Confirmed by Bank
Transaction ID:   1637B2011LDI1328

Debit Account Information

Debit Bank:   011000138
Debit Account:   004602296205
Debit Account Name:   Gordon Brohers Commercial and Industinl
Debit Currency:   USD

Beneficiary Details

Beneficiary Name:   North Mill Capital LLC        Beneficiary Account:   4129015244
Beneficiary Address:   821 Alexander Road Suite 130    Beneficiary Bank ID:   121000248
Beneficiary City:   Princeton                         WELLS FARGO BANK, NA
Beneficiary Postal Code:   08540                      464 CALIFORNIA ST
Beneficiary Country:   US - United States of America  SAN FRANCISCO
                                                      US
                                                  Beneficiary Email:                    (0)

                                                  Beneficiary Mobile
                                                       Number:

Payment Details

Credit Currency:   USD                    Value Date:   03/07/2016
Credit Amount:   725,000.00

Optional Information

Sender's Reference
         Number:   1637B2011LDI1328        Beneficiary Information:

Additional Routing

Intermediary Bank ID:                      Receiver Information:

Control Information

Input:   pmonzionegb                Input Time:   03/07/2016 1220:42 PM EST
Approved:   smacmillangb                  Time:   03/07/2016 1239:04 PM EST
Initial Confirmation:   WTX:20160307000265066
Confirmation #:   FEDR:20160307BBB7HLR007305

This transaction is subject to bank rules and regulations governing such electronic transactions as described in our services agreement. Please keep these numbers handy in case you have any questions regarding this transaction. If any portion of the above is incorrect, or you have further questions, please contact customer service. Thank you.

[ Close ]