## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 7** |
| | : | |
| **Ivan L. Jeffery** | : | |
| | : | |
| **Debtor.** | : | |
| | : | **Case No. 16-15037** |
| | : | |
| **Artesanias Hacienda Real, S.A.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **Ivan L. Jeffery** | : | |
| | : | **Adv. No. 17-0028** |
| **Defendant** | : | |

# O P I N I O N

## I.    INTRODUCTION

In this adversary proceeding, the Plaintiff seeks two measures of relief: that the Debtor be denied a discharge or, alternatively, that the Plaintiff's claim be excepted from discharge.  The Debtor opposes both requests. A trial was held over two- and one-half days. Thereafter, the parties submitted post-trial briefs and the court took the matter under advisement. For the reasons which follow, judgment will be entered in favor of the Defendant/Debtor and against the Plaintiff on all counts.[1]

---

[1] Because these claims involve an objection to discharge and a request that a debt be declared non-dischargeable, they are within this court's core jurisdiction. See 28 U.S.C. § 157(b)(2)(I) and (J) (listing among core proceedings objections to discharge and declarations of non-dischargeability).

## II.    FACTUAL BACKGROUND

After graduating from college with a business degree, the Debtor went into the business of metal casting.  This career choice led him to Pennsylvania where he worked for, and owned, a series of such businesses over the next four and one-half decades.

When he was not working, the Debtor (and his wife) spent time in Florida.  It was their intention to retire there and so in 2008 they created, with the assistance of counsel, an estate plan. Pl.'s Ex. 5A, Tr of 341 Mtg, p. 58.  That plan involved the formation of a revocable trust, which they named after the Debtor's wife, Wilhelmina S. Jeffery (the "WSJ Trust"). Tr. 129-134; Pl.'s Ex. 45.  The Debtor and his wife funded the Trust with four parcels of Florida real estate. The first parcel is the Debtor's current residence, 42584 Maggie Jones Road in Paisley, Florida. Tr. 86; Def.'s Ex. 2; see Case No. 16-15037, Notice of Change of Address, (doc. #19).  The second parcel was identified by the Debtor as 42630 Maggie Jones Road, also in Paisley, Florida.[2] This piece of land was transferred to the Trust by the Debtor and his wife (See Pl.'s Ex. 22), and later transferred to his sister. Tr. 272. The third parcel is 42710/42810 Maggie Jones Road (also in Paisley, Florida).  This is the former pecan (now citrus) farm on which the Debtor grows oranges and which he inherited from his father's estate.  (Tr. 40-41, 97-104; Pl.'s Ex. 27-I; Def.'s Ex. 3). The fourth and last parcel to be transferred to the Trust is 42600 Maggie Jones Road (Tr. 40).  It consists of seven (7) acres which the Debtor and his wife purchased at a Sheriff's Sale. Presently, there is a mobile home on the land which the Debtor and wife rent to a third party.  Tr. 42-43; Def.'s Ex. 4.  So, at the time of his bankruptcy filing, the WSJ Trust owned three (3) parcels of real estate: 42584 Maggie Jones Road ("the Debtor's residence"), 42710/42810

---

[2] The Debtor was not absolutely sure that this was the correct address and the Quit Claim deed which conveyed the property does not list a street address.  The deed contains a legal description containing similarities to the other three which make it safe to conclude that it is nearby, although not contiguous to the other three.

Maggie Jones Road ("the citrus farm"), and 42600 Maggie Jones Road ("the mobile home property").

Although he and his wife were planning their retirement, the Debtor was not yet ready to stop working. In 2010 or 2012, the Debtor acquired Wilton Armetale, Inc. ("Wilton"), a metal casting company.[3] Tr. 175; Pl.'s Ex. 5A, p. 26. The Debtor was its sole officer (President, Secretary, and Treasurer) until July 2015. Pl's Ex. 52. As of that date, another individual took over as President, but the Debtor remained as Wilton's CEO. Pl.'s Ex. 53; Tr. 185.

By the Spring of 2015, Wilton had become unprofitable and its primary lender (M&T Bank) sought to end their relationship. Tr. 324, l:17. M&T was replaced by North Mill Capital, a private equity lender. In deciding to provide financing, North Mill discovered that Wilton's balance sheet did not meet its loan requirements.[4] Tr. 325, l:13-14. Wilton would, therefore, have to come up with additional money from some other source. Id. The Debtor, as Wilton's CEO, agreed to contribute $250,000.00 of his own money and took a second lien position. Id. 20-22. To memorialize this arrangement, North Mill and the Debtor executed what is referred to as a Junior Participation Agreement (the "JPA"). Pl.'s Ex. 48A; Tr. 325, l:10. Under the JPA, the Debtor's right to recover any money from his contribution to Wilton's funding was *entirely* subordinate to that of North Mill. Tr. 326, l:1-9.

Yet even with this new financing, Wilton's fortunes did not improve. By September 2015, the company was not paying on the loan and North Mill declared it in default. Tr. 326, l:4-5. Neither was Wilton paying its vendors because in late November of that year, the Plaintiff, Artesanias Hacienda Real ("AHR"), sued Wilton for $900,000.00 worth of unpaid merchandise.

---

[3] As to exactly when he acquired Wilton, the Debtor's testimony is contradictory: at his 341 meeting, the Debtor testified that he acquired it in 2012 while at trial he testified that it was 2010. It is, however, not a material discrepancy.
[4] M&T was owed approximately $1.6 million at this time. See Pl.'s Ex. 55.

Given these circumstances, North Mill made the decision to liquidate the company by December 31, 2015.[5] Tr. 320 l:6-8.

That deadline came and went yet it was not until February 2016 that North Mill solicited bids from liquidators.[6] Tr. 345, l:3-15. By the end of that month, North Mill accepted the liquidation proposal from Gordon Bros. Ex. 70; Tr. 345, l:4-5. That proposal was for Gordon Bros to pay $725,000.00 for Wilton's non-real estate assets.  Because the purchase price made it unlikely that the Debtor would recover any of his contribution to the North Mill loan, North Mill became concerned that the Debtor might not cooperate in an orderly liquidation of the company. Ex. 77, Tr. 358-59, l:15-6.  To avoid that, North Mill proposed that when it came time to sell the Wilton real estate, North Mill and the Debtor would share any net proceeds resulting from that sale. Id. 358, l:4-9.  This was acceptable to the Debtor but conflicted with the terms of the JPA which gave North Mill's secured interest absolute priority over the Debtor's.  North Mill and the Debtor therefore amended the JPA to reflect that any net proceeds remaining from the sale of the Wilton real estate would be shared between North Mill and the Debtor on an 80/20 basis. Pl.'s Ex. 48B.  With that in place, the Debtor, as CEO of Wilton, executed the requisite consent to accept the Gordon Bros proposal. Pl.'s Ex. 89.

Liquidation of Wilton, however, did not stop those creditors who had recourse against the Debtor.  Chief among them was the Plaintiff, whose claim the Debtor had personally guaranteed. On April 7, 2016, the Plaintiff obtained a judgment against him for $923,000.00. Pl.'s Ex. 4.  At about the same time, North Mill confessed judgment against the Debtor (likewise, based upon his

---

[5] It was anticipated that a liquidation would take 90 days.

[6] The delay was due, in part, to two circumstances. First, during that time at least three prospective buyers inquired about an acquisition, but nothing came of that. Second, North Mill held out some hope that the holiday shopping season would yield better than expected sales but that too did not happen.

personal guaranty).[7] The Debtor's combined debt to both the company's major supplier and its first secured lender now exceeded $2 million.  And his counsel advised him that he should fully expect the Plaintiff to pursue collection of its judgment against him (Pl.'s Ex. 97).  All of this prompted the Debtor to seek bankruptcy protection.  On July 15, 2016, he filed a Chapter 7 case. Pl.'s Ex. 1A.

In her investigation of the Debtor, the Chapter 7 Trustee discovered that his schedules of assets and income and his Statement of Financial Affairs ("SoFA") were deficient.  On at least two (2) occasions, the meeting of creditors was continued so that the Debtor could provide the Trustee with required documentation. The Schedules and SoFA would be amended four (4) times.[8]  In all, the Trustee would have to continue the 341 meeting of creditors six (6) times over a period of six (6) months before she could begin liquidating assets. The liquidation involved the sale of a car and the filing of a handful of avoidance actions, one of which was brought against the Debtor and his wife.[9]  The case administration did not, however, involve an objection to the Debtor's discharge. The Plaintiff, however, did see grounds for such a challenge.  AHR filed this complaint for denial of discharge, and alternatively, excepting its claim from any discharge which might be granted.

---

[7] The record is unclear as to exactly when North Mill confessed judgment against the Debtor. His Schedule F states that it occurred on April 29, 2016, but the judgment has not been made part of the record.  A May 3, 2016, email between counsel for Debtor and counsel for North Mill mentions that a judgment has been confessed against the Debtor.  Pl.'s Ex. 98.

[8] The Debtor's Schedule A/B twice (doc. ## 22,33), his Schedule I once (doc. #34), and his SoFA once (doc. #35)

[9] The Trustee alleged therein that the Debtor commingled over $900,000.00 of his own money with the couple's marital bank account. The dispute was settled for $275,000.00.

## III – PROCEDURAL BACKGROUND

The Complaint

In its original form, the Complaint plead five (5) counts: Counts I through III contested the Debtor's entitlement to a discharge generally: 11 U.S.C. §727(a)(4)(A) (making a false oath), (a)(2)(A) (intentional concealment), and (a)(3) (concealment of records); Count IV sought dismissal for a failure to comply with a request to produce tax returns under 11 U.S.C. §521(e)(C) [*sic*];[10] and Count V sought a declaration that the Plaintiff's debt was excepted from the Debtor's discharge under 11 U.S.C. §523(a)(6).

Summary Judgment Rulings

The first of two (2) summary judgment rulings resulted in the dismissal of Count IV. See Case No. 16-15037, ##49, 50, also reported at 2018 WL 1605307 (Mar. 29, 2018, Bankr. E.D.Pa.) The second ruling addressed cross-motions. It denied Plaintiff's motion entirely and granted Defendant's motion, but only as to Count III. That left for trial the remaining three (3) counts:

Count I - Objection to Discharge under 11 U.S.C. § 727(a)(4);

Count II - Objection to Discharge under 11 U.S.C. § 727(a)(2)(A) and (B); and

Count V - Exception to Discharge under 11 U.S.C. § 523(a)(6)

Presumption, Burdens of Proof and Evidentiary Standards

All three (3) legal theories carry a high evidentiary burden. Objections to discharge are liberally construed in favor of the debtor and strictly construed against the objector. Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir.1993) (admonishing that denying a debtor his discharge "is an extreme step and should not be taken lightly."); see also In re Singh, 433 B.R. 139, 154–55

---

[10] What was meant was 11 U.S.C. §521(e)*(2)*(C).

(Bankr. E.D. Pa. 2010) <u>quoting</u> <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786 (1st Cir.1997) ("The

reasons for denying a discharge to a bankruptcy must be real and substantial, not merely

technical and conjectural.").  The same presumption applies to exceptions to discharge.  <u>In re</u>

<u>Cohn</u>, 54 F.3d 1108, 1113 (3d Cir.1995).

A creditor objecting to a debtor's discharge under §727(a) bears the burden of proof.  Fed.

R. Bankr.P. 4005.  So does a creditor objecting to the dischargeability of an indebtedness.  <u>In re</u>

<u>Cohn</u>, <u>supra</u>, <u>id</u>.  To meet the burden, the creditor must prove its case by a preponderance of the

evidence.  <u>In re Raftogianis</u>, 2012 WL 2885469, at *5 (Bankr. E.D. Pa. July 13, 2012); <u>Grogan v.</u>

<u>Garner</u>, 498 U.S. 279, 287-88, 111 S.Ct. 654, 659-60, 112 L.Ed.2d 755 (1991).

## IV ANALYSIS

Count I – 11 U.S.C. §727(a)(4)(A) False Oath or Account

Section 727(a)(4)(A) provides that a discharge will be denied to a debtor who "in or in

connection with the case—(A) made a false oath or account." Paragraph (4)(A) "is designed to

ensure that the debtor puts dependable information in the hands of those interested in the

administration of the bankruptcy estate without the need for the trustee or a party in interest to

engage in costly, exhaustive investigations to ferret out the truth concerning the Debtor's

financial condition." <u>In re Giquinto</u>, 388 B.R. 152, 178 (Bankr. E.D.Pa.2008).  This duty to

disclose begins at the inception of the case: Fed. R. Bankr. Proc. 1005 sets forth the information

which the voluntary petition must contain.  After the petition is granted (i.e., an order for relief is

entered) §521 requires that the debtor file a schedule of assets and liabilities, and schedule of

current income and expenditures, a schedule of executory contracts and unexpired leases and a

statement of financial affairs. 11 U.S.C. §521(a)(1)(B); Fed. R. Bankr. Proc. 1007(b).

Importantly, "[a]ll petitions, schedules, statements and amendments thereto shall be verified or

contain an unsworn declaration as provided in 28 U.S.C. § 1746." Fed.R.Bankr.Proc.

1008; see In re Kasal, 217 B.R. 727, 734 (Bankr.E.D.Pa.1998) ("Section 727(a)(4)(A) applies

"not only to false statements made under sworn oath, but also to unsworn declarations under

penalty of perjury, such as those made by a debtor on Official Bankruptcy Forms.'"")  A material

"false statement made in a bankruptcy petition, schedule or statement of financial affairs

constitutes a false oath within the meaning of [s]ection 727(a)(4)(A)." In re Raftogianis, supra at

*5; In re Senese, 245 B.R. 565, 574 (Bankr. N.D.Ill.2000); see In re Strickland, 350 B.R. at 163

(citing Fed. R. Bankr. P. 1008 and 28 U.S.C. §1746).

Elements of 11 U.S.C. §727(a)(4)(A)

        To deny a discharge due to an alleged false representation, a creditor must prove that: (1)

the debtor made a false oath or statement, (2) the debtor knew the statement was false, (3) the

debtor made the statement with the intent to deceive, and (4) the statement was material to the

bankruptcy case.  In re Hatch, 2009 WL 3208694 at *8 (Bankr. E.D. Pa. Sept. 30, 2009).  The

Plaintiff maintains that the Debtor's disclosures in the Voluntary Petition, Schedules, and SoFA

are riddled with falsehoods. The Plaintiff's evidence on that point is as follows.

Voluntary Petition

        Part 3 of the Voluntary Petition instructs the petitioner to "[r]eport about any business

you own as a sole proprietor." The first question in that part asks if the debtor is "a sole

proprietor of any full- or part-time business." Vol. Pet. ¶12., The Debtor's answer was "no."

At trial, the Debtor admitted that he *was operating* the citrus farm known as the Paisley Navel

Yard at the time of the bankruptcy filing. Pl.'s Br. 10. Tr. 34-35; Pl.'s Ex. 31A.

Schedules

The Plaintiff also contends that the Debtor's schedules are deficient. The purpose of

the schedules is to provide an accurate list of ownership in property.  In re Clark, 2016 WL

1377807, at *8 (B.A.P. 9th Cir. Mar. 29, 2016), aff'd, 693 F. App'x 644 (9th Cir. 2017).

Schedule A/B: Property requires disclosure of a debtor's real and personal property.  The

Plaintiff identifies eleven (11) instances where the Debtor failed to list all of his property.

- Electronics

Part 3 (Personal and Household Items), Item #7 requires disclosure of electronics.  This

includes examples such as "televisions and radios; audio, visual, stereo and digital equipment;

*computers*, printers, and scanners; music collections; electronic devices including cell phones,

cameras, media players, games." [emphasis added].  The Debtor listed none.  AHR points out

that at trial the Debtor admitted that he owns a desktop computer, a laptop computer, and a

digital irrigation system for his citrus farm. Pl.'s Br. 12. Tr. 39, 143-145.

- Trusts

Turning next to Part 4, Financial Assets, Item #25 of Schedule A/B requires disclosure of

any "trust, equitable or future interests in property, and rights or powers exercisable for his

benefit." The Debtor indicated he had no such interests.  The Plaintiff maintains that the

evidence offered at trial directly contradicts this: the Debtor is named as a beneficiary of the

Wilhelmina S. Jeffery Revocable Trust.  Pl.'s Br. 11. Pl.'s Ex. 45, ¶5A. Tr. 128-136, 146-47.

- Internet Names

Item #26 requires disclosure of any "patents, copyrights, trademarks, trade secrets, and

other intellectual property." This is followed by examples among which are "internet domain

names" and "websites." Debtor stated that he had no such property. Here again, adds Plaintiff,

the Debtor testified to having a website for the Paisley Pecan Farm and Paisley Navel Yard. Pl.'s Br. 11; Tr. 82, 147-48; Pl.'s Ex. 28.

- Insurance

Item #31 requires a debtor to disclose "interests in any insurance policies." Listed as examples are "health, disability, or life insurance, health saving account; credit, homeowner's, or renter's insurance" policies. The Debtor's original and first amended Schedule A/B did not list any insurance policies. His second amended Schedule A/B does: there, the Debtor lists two (2) policies with New York Life, but nothing else. At trial, the Debtor admitted to having obtained insurance policies for two of the properties in the WSJ trust: 42584 and 42600 Maggie Jones Road. The policies named the Debtor and his wife as the insured, and not the Trust. This, despite the fact, says Plaintiff, that those properties belong to the Trust. Pl.'s Br. 11. Tr. 92-94, 107, 111, 114, 125-26, 152-55; Pl's Ex. 24, 26, 36, and 37.

- Claims Against Third Parties
  and Contingent/Unliquidated

In a section entitled "Debtor's Failure to Disclose Contracts in Which Debtor had an Interest" (Pl.'s Post-Trial Br. 12), Plaintiff cites what it says are four (4) more failures to disclose: the 4-year contract with Cast-Rite Metal, Inc.,[11] the JPA with North Mill, the Amendment to the JPA, and his agreement with Faryna Grove Care for his citrus farm. The Plaintiff fails to specify where on Schedule A/B these assets should have been disclosed and points generally to "Items 20-27 and 34-35." Id.

At the outset, it is clear that items ## 20-27 of Schedule A/B are inapplicable. The eight (8) types of property in ## 20-27 consist of specified financial assets: bonds, retirement accounts,

---

[11] Cast-Rite Metal, Inc. is another foundry in the Reading area. Under their agreement, the Debtor would earn a 5% commission for any business referred. Tr. 136-37

security deposits, annuities, educational accounts, trusts, intellectual property, and licenses. None of the four (4) alleged nondisclosures cited by Plaintiff are of that type.

Similarly, the commissions which Debtor received from Cast-Rite Metal are miscast. They sound more like an executory contract reportable on Schedule G than a contingent claim on Schedule A/B.[12]  Weaker is Plaintiff's insistence that Debtor's relationship with Faryna Grove Care, the Florida company that managed his orange grove, should have been disclosed as any type of property.  The mere existence of that relationship does not constitute property.

Where Plaintiff is partially correct is with Items ## 34-35.  Those two (2) types of assets include "Other contingent and unliquidated claims of every nature including counterclaims of the debtor and rights to set off claims." (Item #34) and "[any] financial assets you did not already list." (Item #35).  The First Amendment to the JPA would arguably be reportable under Item #34 (any "other contingent or unliquidated claims") because the Debtor had a potential right to share in the proceeds from the sale of Wilton's real estate *if the price met a certain threshold*. Pl.'s Ex. 48B. Given that the JPA had been amended by the date of the filing, there would be no reason to list it as a separate item.  The Debtor had only one (1) claim against Wilton for his $250,000.00 contribution to the North Mill loan.  He was never repaid that money and because the claim stood on the date of bankruptcy it should have been disclosed.  So, of the four (4) items of property which Plaintiff identifies here, the only one which should have been but was not reported is the amended JPA.

---

[12] The Debtor listed this income on his Amended SoFA (Part 2, ¶5 Other income) and Schedule I at line 8(h).

- Interests in Business-Related Property

Item #37 asks if the debtor "own[s] or ha[s] any legal or equitable interest in any business-related property." The Debtor answered "no." But at trial, the Plaintiff points out, he admitted to operating a citrus farm in Florida. Pl.'s Br. 10; Tr. 153-55.

- Interests in Farm-Related Property

Likewise, Item #46 asks if the debtor "own[s] or ha[s] any legal or equitable interests in any farm- or commercial fishing-related property." Here, again, the Debtor's answer was "no." If his trial testimony, as corroborated by the Plaintiff's exhibits, demonstrated that he did own a business and that business was a citrus farm, then the answer to this question should likewise have been the affirmative[13] Pl.'s Br. 10; Tr. 154-55.

## Statement of Financial Affairs

The Plaintiff adds deficiencies in the disclosures are not limited to assets. AHR identifies eight (8) instances where the SoFA is false. The SoFA provides creditors and the court with "detailed information about the debtor's financial condition and history." In re Morris, 2019 WL 5846841, at *2 (B.A.P. 9th Cir. Nov. 6, 2019); see also 4 Collier on Bankruptcy ¶ 521.09 (16th 2022) ("The purpose of the requirement of filing a statement of financial affairs is to furnish the trustee and creditors with detailed information about the debtor's financial condition, thereby saving the expense of long and protracted examination for the purpose of soliciting the information.")

---

[13] The corollaries to these disclosures—had they been properly made—was to list the value of that interest. See, e.g., Item #60 (Value of interest in farm-related property).¶

- Income

The first omission in the SoFA which Plaintiff cites is found in Part 2.  There, Question #4 asks if Debtor had "any income from employment or from operating a business *during the year* or the two previous calendar years." [emphasis added] The Debtor responded "yes," and disclosed $61,927.92 of income earned during the calendar year 2015 and $66,525.00 of income earned during the calendar year 2014.  The SoFA is silent as to any income for 2016.  However, the Debtor admitted that he continued to receive a salary from Wilton for the first ten (10) weeks of 2016.  Pl.'s Br. 12; Tr. 176-180; Pl.'s Ex. 2.[14]

- Payments to Insiders

Question #8 asks if "within 1 year before [he/she] filed bankruptcy, [the debtor] made any payments or transfer any property on account of a debt that benefitted an insider." The Debtor answered "yes" and disclosed two (2) such payments: one to satisfy the mortgage on his residence (42584 Maggie Jones Road) which is owned by the Trust; and the second to pay off a line of credit secured by his and his wife's former home in Pennsylvania.

The Debtor was correct to report both payments as benefits to an insider. Not only was his wife an insider,[15] but the Trust was as well.  See In re Gamble, 2018 WL 3629968 (Bankr.W.D. Okla. 2018) (explaining that a debtor who was beneficiary of Trust for whose benefit he satisfied debt made an insider transfer).  That, however, was not the only payment that the Plaintiff alleges benefitted the Trust.  In addition, the Debtor did not disclose $200,000.00 worth of payments he made for various farm-related improvements to the Florida real estate in

---

[14] While the testimony did not arrive at a specific amount which Debtor received as income from Wilton in 2016, the Court's review of his bank statements leads it to conclude that he received somewhere between $8,400.00 to $8,500 for the period January through mid-March 2016.  See Pl.'s Ex. 2.
[15] See 11 U.S.C. §101(31)(A)(i) (listing among the examples of insider a "relative").

the Trust: well and irrigation systems and the planting and care of 5,500 citrus trees.  Pl.'s Br. 11;

Pl.'s Exs. 31A-35; Tr. 127

- Gifts

Question #13 asks if "within 2 years before [he] filed for bankruptcy, [the debtor] gave

any gifts with a total value of more than $600 per person?"  The Debtor's answer was "no."  This

is false given his testimony at trial that he gave his brother $10,000.00 within one month of his

bankruptcy filing.  Pl.'s Br. 12; Tr. 114-15, 156-57; Pl.'s Ex. 49.

- Transfers Outside the Ordinary Course of Business

In Part 7 ("List Certain Payments or Transfers"), Question #18 asks if "[w]ithin 2 years

before you filed bankruptcy, did [the debtor] sell, trade, or otherwise transfer any property to

anyone, other than property transferred in the ordinary course of your business or financial

affairs?" The Debtor answered "no." At trial, however, he admitted that he sold over $20,000.00

worth of timber harvested from the Florida real estate during that time period.  Tr. 156; Pl.'s Ex.

30.[16]   While the Plaintiff alleges that the timber sale represents a transfer of property owned by

the debtor and sold to a third party, he incorrectly characterizes that sale.  If the transfer involved

property owned by the debtor, I agree that such a transfer would properly be disclosed here.

However, the timber was located on land owned by the Trust and as such constituted property

owned *not* by the debtor but by the Trust.  Accordingly, disclosure of the sale is not

contemplated within this portion of the SoFA.

- Transfers to Self-Settled Trusts

Question #19 asks whether "[w]ithin 10 years before you filed for bankruptcy, did you

transfer any property to a self-settled trust or similar device of which he is a beneficiary. (These

---

[16] Although evidence was presented as to this omission at trial, it was not listed among the non-disclosures in Plaintiff's Post-trial Brief.

are often called asset-protection devices)." He answered "yes" disclosed his residence at 42584

Maggie Jones Road, Paisley, Florida, and stated that the transfer was made on February 1, 2008.

However, what he failed to disclose, says Plaintiff, are two other parcels of Florida real estate

which he transferred to the trust within that time frame. The first was 42710/42810. That real

estate was transferred to the Trust in 2011.  Pl.'s Br. 10; Tr. 92:19-93:21, 157-58. The second

was 42600 Maggie Jones Road, the mobile home property.  Pl.'s Br. 11; Pl.'s Ex. 5A, § 341

hearing Tr. at 60:8-61-61:15.

- Property Held or Kept for Another

Question #23 asks if the debtor "hold[s] or control[s] property owned by someone else."

This is meant to include "property borrowed from, stored for, or held in trust for someone."

The Plaintiff insists that Debtor should have "disclosed his holding and control of the Maggie

Jones Road Properties." Pl.'s Br. 12.  No trial testimony or other evidence is offered in support

of this purported omission.

- Businesses Owned Within the Last 4 years

Question #27 asks whether "within the 4 years before he filed for bankruptcy [he] either

owned or had any of the following interests in a business: sole proprietor, limited liability

interest, partnership, officer, director, or managing executive of a corporation, or ownership of at

least 5% of the voting or equity securities of a corporation." If the answer is "yes" then a debtor

must indicate the business form and fill in the details for each such business including name and

address, description of the nature of the business, and tax-identifying information.  The Plaintiff

alleges that the Debtor failed to disclose the pecan business which he operated from 2012 to

2014 or the citrus farming business he was operating in Florida in 2015 and 2016.[17]

---

[17] This disclosure should also have been made on the Voluntary Petition in Part I, section 4. There, a debtor is
required to identify any business name under which he/she operated during the 8 years prior to bankruptcy. This

Before addressing the second element of section 727, I am compelled to make note of the

Plaintiff's myriad allegations of false statements or omissions contained in the Complaint.  It is

important to understand the practical aspects of a Chapter 7 filing and the completion of the

statements and schedules.  While the Plaintiff takes great pains to point out even the smallest of

omissions (i.e., failure to list a personal computer on Schedule A/B) in an effort to characterize

this case as an egregious abuse of the system, such an approach ignores the realities of the

practice.  While it is true that a debtor in a Chapter 7 case must be forthright in disclosing all

assets to which he has an ownership interest, the schedules do not require a fully itemized list of

all individual pieces of property.  Rather, they require disclosure of enough information for the

Trustee and creditors to understand the breadth of the assets owned.  For this reason, several of

Plaintiff's allegations simply "miss the mark."

<u>Knowledge of Falsity</u>

Next, I will turn to the failures to disclose themselves. To varying degrees, each of these

responses is sufficiently inaccurate to constitute a false statement for purposes of 11 U.S.C.

§727(a)(4)(A).  The question becomes, then, whether this Debtor knew that the representations

he was making were, in fact, untrue.  A false statement is made knowingly if the statement is (1)

known by the debtor to be false; (2) made without belief in its truth; or (3) made with reckless

disregard for the truth. <u>In re Young</u>, 576 B.R. 807, 815 (Bankr. E.D. Pa. 2017).  "[C]ase law

provides that reckless disregard for the accuracy of the of the oaths made in a bankruptcy case

satisfies the scienter requirement under subparagraph (4)(A)." <u>In re Clark</u>, 2018 WL 4940799, at

*7 (Oct. 10, 2018, Bankr. E.D. Pa.)  With the caveat stated above regarding the over

---

includes trade names and *doing business as* names. Vol. Pet. Pt.1, ¶4. To this, he answered "I have not used any business names or EINs." That is simply false: he was operating a sole proprietorship under the Paisley Pecan and Paisley Navel Yard trade names during that time period. Pl.'s Ex. 28, 29, 31A, Tr. 34-35.

identification of omissions by Plaintiff,  I find that there are several instances in which the

Debtor had to know that he was answering the forms incorrectly.  These items include the failure

to identify the businesses and its related assets, the real estate included in the Trust, the interest

in the Trust instrument itself, and the gift to his brother.

<u>Intent</u>

Before addressing the Debtor's intent with respect to the various nondisclosures

identified by the Plaintiff, I note that I found the Debtor's testimony at trial to be credible.  Mr.

Jeffrey did not appear to be evasive when answering Plaintiff's questions, nor did he deflect or

become overtly defensive in his testimony.  He admitted to making mistakes on the schedules

and appeared to be straightforward and honest in describing the financial situation which

preceded the filing of the bankruptcy case and the various complications that surrounded the

failure of his business.

As indicated above, I find that the various failures to disclose identified by the Plaintiff

range widely in type and vary in the degree to which they affect this case.  As a result, the best

means for determining intent is to first categorize the misstatements based on commonalities.

From there, the failures to disclose can be analyzed using a holistic approach to see if that yields

an explanation for why the Debtor got so much of this wrong.  <u>See</u> <u>In re Oakley</u>, 503 B.R. 407,

426 (Bankr. E.D. Pa. 2013), *aff'd*, 530 B.R. 251 (E.D. Pa. 2015) (explaining that the requisite

intent under §727(a)(4) can be proved by circumstantial evidence or inferred from a pattern of

nondisclosure and concealment).

The thread which runs through the majority of these failures is that they involve the

Debtor's intended retirement to his Florida home and citrus farm.  This relocation had been

planned at least eight (8) years earlier when the Debtor and his wife created a revocable trust into

which they started transferring Florida real estate.  The Debtor and his wife created a trust which

named him as beneficiary. They funded the trust with four (4) parcels of real estate.  They

insured the real estate which the Trust owned in their name.  The Debtor was operating a farming

business on the Trust property.  That business had a website, and its crop was watered by a

satellite-operated irrigation system.  That business was serviced by vendors who were paid by

the Debtor.  And from the portion of the Trust property that was neither arable nor developable,

the Debtor harvested and sold $20,000.00 of timber.  The Debtor did not see fit to disclose any of

this.

Debtor's Interest in and
Corpus of the WSJ Trust

       Yet the parties should not understand me to mean that the Trust is irrelevant here.  The

Debtor is a beneficiary of the Trust, yet when it came time to disclose that interest he failed to.

Similarly, when he was required to disclose what property he transferred to the Trust, he

disclosed only *one* (1) parcel of real estate when, in fact, he transferred *four* (4) pieces of real

estate.  But as troubling as this may appear, the Debtor did not hide the Trust. <u>Cf In re Fink</u>, 351

B.R. 511 (Bankr. N.D. Ill. 2006) (denying discharge to debtor engaged in divorce proceeding

who did not disclose revocable trust on schedules). And of the Trust property the Debtor failed to

disclose on his SoFA, he informed the Trustee of the 42600 Maggie Jones Road property at the

first scheduled 341 meeting (August 22, 2016) (<u>see</u> Pl.'s Ex. 5A, p. 110) and 42710/42810

Maggie Jones Road at the second scheduled 341 meeting (December 5, 2016) (<u>see</u> Pl.s Ex. 5B, p.

93).  Moreover, his testimony at trial reveals an uncertainty as to what his exact interest in the

Trust was.  Figuring out the details and ramifications of the Trust was something that the Debtor

left to his counsel. Tr. 130:19-20. This indicates that the Debtor relied in good faith on his

counsel's advice.  This was, after all, the same counsel that had set up the Trust in the first place.

Insurance Policies
On Florida Properties

Also related to the Trust—albeit less directly—is the failure to disclose certain homeowner's insurance policies. These policies insured two (2) of the Florida real estate parcels that the Trust owns. The policies, however, do not list the Trust as the insured but list the Debtor (and his wife) as the insureds. At trial, the Debtor testified that he did not know why the policies were titled that way. He assumed his insurance agent "knew what he was doing." Tr. 282-83. The Debtor admitted to never really reviewing the policies when he received them. Id. This is another example of an oversight as opposed to wrongful intent.

Citrus Farm Related
Nondisclosures

Next is the Debtor's failure to disclose his farm business. There are several such instances of the Debtor simply failing to disclose some required information about the citrus farm. No good explanation has been offered for why the Debtor did not disclose the citrus farm on his petition, on his Schedule A/B, or on his SoFA. See In re Isaacson, 478 B.R. 763, 788 (Bankr. E.D. Va. 2012); In re Tylee, 512 B.R. 409, 417 (Bankr. E.D. N.Y. 2014); In re Haynes, 549 B.R 677, 686-87 (Bankr. D.S.C. 2016). The same can be said for his website for the pecan farm or the electronics he owned, especially the digital watering system which irrigated his farm. Tr. 39. All were direct questions which required little thinking to answer truthfully.

The general practice with respect to individual assets used in a business is that the debtor lists his interest in the business on Schedule A/B as well as the SoFA based on a valuation of the assets and liabilities owed by the business. The individual property assets of the business may or may not be itemized on Schedule A/B but will be a supplement provided to the Trustee at the 341 meeting. The troubling issue is not the omission of the individual business assets (website,

watering system, etc.) but rather the failure to identify the business at all.  Here, as with the

disclosure of the Trust, assistance of counsel to make sure that the documents were completed

correctly would have been beneficial.  The Debtor's tax returns certainly identify the business

and most of the equipment.  Those returns should have been provided to counsel as part of the

initial preparation of the petition and schedules.

The Debtor's testimony is that, in retrospect, he should have, but did not think of the farm

as much of a business. He "just wasn't thinking along those lines." Tr. 288.  It appears that the

farm was more an avocation, as it "gave [him] something to do." Tr. 71.  That is not to say that

the Debtor did not want to make a profit from the farm (Tr. 70), but only that he could not say if

he ever would ("It's still iffy, fifty-fifty." (Tr. 71)).  While this is a poor excuse for not disclosing

the asset, the testimony does indicate that the Debtor was not trying to hide anything.  As

indicated above, much of the farm machinery and equipment were listed on the Schedule F

attached to his tax returns.  These returns were provided to the Trustee as well as interested

parties who appeared at the §341 meeting and continued meeting.  Pl.'s Exs. 5A and 5B, Tr. of

§341 meetings.

<u>Transfers for the
Benefit of an Insider</u>

The next of the failures to disclose which implicate the Trust are the $200,000.00 worth

of payments which the Debtor made for the Trust's benefit.  To reiterate, the Plaintiff maintains

that these payments should have been disclosed on the SoFA as payments benefitting an insider.

A trust of which a debtor is a beneficiary is an insider of the debtor.  <u>See</u> <u>In re Eddy</u>, 2015 WL

1585513, at *9 (Bankr. M.D. Fla. Apr. 3, 2015) (relying on legislative history[18] of definition of

---

[18] S.Rep. No. 95–989, at 25 (1978), 1978 U.S. Code Cong. & Admin.News 5787, 5810; H.R.Rep. No. 95–595, at 312 (1977) ("one who has a sufficiently close relationship with the debtor such that the conduct is made subject to closer scrutiny than those dealing with the debtor at arm's length.").

insider to find that trust is insider of debtor who is its beneficiary).  But I don't see how these payments benefitted the Trust.[19]  The payments appear to have been for machinery and equipment and for services rendered necessary to operating a citrus farm.  The citrus farming business belonged to the Debtor and the benefit of those payments inured to *his* benefit.  The Debtor testified that he was dealing with the various vendors who regularly supplied goods and services to the farm, and he wanted to ensure that they would be paid. Tr. 283. This does not appear to be an omission on the Debtor's part and even, assuming it is, then it does not appear to be an intentional failure to disclose.

Transfer Outside the
Ordinary Course of Business

The last purported non-disclosure that relates to the Trust involves the Debtor's sale of timber from the Florida real estate.  I am not persuaded that the Debtor's selling $20,000.00 worth of timber was somehow *in* the ordinary course of his business which would have meant that the sale did *not* have to be disclosed.  It is not clear why the Debtor, a citrus farmer, would have entered into the transaction in the first place.  The logging did not occur on the acres on which the citrus trees were planted.  Rather, it occurred on the 90 acres that the Debtor described as "sinkholes and pine trees and oak trees, sand, swamp." Tr. 290 [*sic*] It was land that could not be developed without difficulty.  Id.  This then shifted the burden of proof to the Debtor to prove that the sale was part of his business.  He did not.

Even so, the evidence demonstrates that the Debtor did not intend to hide the transaction. At trial he provided background as to how the sale came about.  The Debtor recalls being

---

[19] The Trustee filed nine (9) avoidance actions against the same vendors on the theory that the Debtor's payment to each vendor benefitted not the Debtor but the Trust and was, therefore, a fraudulent transfer. No evidence of the viability of that theory was offered at trial. While the docket reflects that two (2) of the vendor defendants settled with the Trustee, they may very well have done so by paying a nuisance value payment to be rid of the litigation. In other words, no findings can be made from the Trustee's avoidance suits.

approached by a land manager who proposed that the manager assess the trees on the property

for harvesting; that after assessing the site, the manager concluded that there were enough trees

to cut and sell while still allowing enough room for future growth; that the manager assured the

Debtor that he would handle everything; that the manager retained a timber cutter who would cut

the selected trees; and that when the job was complete, the proceeds would be split between the

Debtor and the manager on a 90/10 basis.  That being agreeable to the Debtor, the harvesting

proceeded, and the Debtor ultimately received $20,000.00  Tr. 295.

 Several factors point to a conclusion that this transaction was not nefarious.  To begin

with, the sale was not initiated by the Debtor, but by a third party.  In fact, the Debtor had never

had timber cut on the property before.  Tr. 296.  Neither, for that matter, had his father done this,

although he had cleared ground for the planting of pecan trees.  Tr. 284:19-20.  Also worth

considering is that pursuant to Florida common law and case law, standing timber is part of the

real estate on which it grows.  Kim v. Galasso, 348 So.3rd 1183, 1188 (Fla. Dist. Ct. App. 2022).

That would mean that the proceeds belonged to the Trust.  Further,  the Debtor reported the

proceeds as income taxable to himself consistent with the IRS regulations applicable to grantor

trusts.  Pl.'s Ex. 43B; Tr. 67:1-19; 260:14-261:5; see also 26 U.S.C. §671; 26 C.F.R. §1.67–2(a)

(attributing trust income to grantors and substantial owners);  Textron Inc. v. Comm'r., 117 T.C.

67 (2001) (explaining that §671 of the IRC provides that the deemed owner of the trust, rather

than the trust, is obligated to pay taxes on the trust's income).  What transpired does not look to

me like deforestation for a profit, but more like husbandry.

 And other things were going on in the Debtor's life that explained why he was not

thinking about the transaction in terms of disclosing it later.  At this time, the Debtor had an

unspecified ankle injury,[20] was still running his business (Wilton), and was in the process of

moving to Florida. Tr. 297. In other words, he "just wasn't thinking about it." Id. But he insists

that he did not hide anything in this regard, nor could he given that the sight of logging trucks

driving on and off his property was in full view. Id. I find the Debtor's testimony here to be

credible.

Contingent and
Third-Party Claims

Turning from the Debtor's Florida affairs to his last years in metal casting, I do not find

any intent to hide an asset in the failure to disclose either the JPA or the amendment to it. The

original JPA was replaced by the First Amendment to the JPA prior to the filing. In July 2016,

debtor had one (1) contingent property interest against Wilton which was encompassed in the

amended agreement. It is correct, as Plaintiff says, that this interest should have been disclosed

regardless of value. In re Spencer, 359 B.R. 357 (B.A.P. 6th Cir. 2006) (explaining that

notwithstanding lack of value of claim does not excuse requirement of full and complete

disclosure so that interested parties may fully evaluate the assets).

Yet while he should have disclosed the agreement, the Debtor's testimony sheds light on

why he did not. As far as the JPA was concerned, the Debtor understood that if the company

defaulted, the lender could exercise any remedies available to it without consulting the Debtor.

Tr. 140. As it turned out, Wilton did default which meant that the Debtor would not receive

anything for his contribution to the company's financing. Tr. 238. And with regard to the First

Amendment to the JPA, the Debtor had the same expectation. The amendment was something he

left to his counsel to negotiate (Tr. 141, 146, 197, 222). Counsel concluded that the best-case

---

[20] He used the term "ankle release" which might be reference to ankle surgery, but this testimony was never developed.

scenario for the Debtor was that he *might* receive $50,000.00 to $75,000.00 when the Wilton real

estate was sold. Tr. 204; Pl's Ex. 83.  But the Debtor believed that he would not receive anything

from the sale of the assets of Wilton. Tr. 301.  This does not strike me as an unreasonable belief

on the Debtor's part: he knew the company intimately and the industry generally given his

experience. And so, because he believed that his chances of any recovery were speculative, his

failure to disclose is understandable. Moreover, this is another instance where counsel should

have instructed the Debtor to disclose; like counsel's involvement in the creation of the Trust, the

same counsel negotiated the First Amendment to the JPA.   Cf. In re Herman, 495 B.R. 555, 596

(Bankr. S.D. Fla. 2013) (finding that debtor's interest in a bonus from the $10 Million Fee was a

contingent estate asset and had to be disclosed); In re Sohmer, 434 B.R. 234, 256 (Bankr. D.

Mass. 2010) (holding that debtor personal injury lawyer who failed to list his list of pending

cases was guilty of false oath under section 727(a)(4)); and In re Shoemaker, 2019 WL 2774265,

at (9th Cir. B.A.P., July 1, 2019) (finding that attorney's initial failure to disclose pending

lawsuits among "other contingent and unliquidated claims" a false oath when amendment later

valued the lawsuits at $10 million).  This is another instance where counsel apparently failed to

instruct the Debtor as to the broad extent of his asset-disclosure duties.

Income in 2016

Harder to explain is the Debtor's failure to disclose the approximately $8,000.00 salary

he received from Wilton in 2016.  At trial, the Debtor first testified that perhaps he was not paid

in 2016 (Tr. 176).  But when presented with his bank statements for the first ten (10) weeks of

2016, the Debtor admitted that he continued to receive salary from Wilton for that limited time

period. Tr. 178.  No explanation for the omission was given.

Determining if the salary was left out intentionally is difficult because the Debtor

disclosed salary from Wilton for the previous two (2) calendar years. See Am. SoFA, Pt. 2, Item

#4. So, this is not a case where a debtor hides a different, or second, source of income. See, e.g.,

In re Yonkers, 219 B.R. 227, 232 (Bankr. N.D. Ill. 1997) (finding that debtor's failure to disclose

income from second job constituted false oath warranting denial of discharge).  This appears

more like carelessness on the Debtor's part.

Cash Gift to Brother

Also problematic is the cash gift to the Debtor's brother.  A gratuitous transfer in a round

amount ($10,000.00) made within thirty (30) days of bankruptcy to a sibling is suspicious.  At

summary judgment, the Debtor attempted to explain the transfer first as compensation for

services rendered.  At trial, he testified that the payment was for someone in hardship.  His

brother had recently suffered a house fire which left him homeless and destitute. Tr. 114.   The

payment was to help him weather a misfortune.  The Debtor described his brother as a "day

laborer" when it came to making a living so the implication is that the brother never had much.

Id.  On cross-examination however, the Debtor admitted that his brother received a sizeable

bequest ($479,000.00) from the estate of their father.  Tr. 312.  That, however, occurred several

years prior to this bankruptcy filing and included the value of farmland in Michigan transferred

to him from the estate, rather than liquid assets.  Id.  This gift, on the other hand, was relatively

current and given the moderate amount, I find that the Debtor's impulse here was charitable.[21]

The Debtor's testimony was sincere with respect to his intent to help his brother at a time when

he had suffered a complete loss of his home and personal property.  There was no indication in

---

[21] It would be left then to the Trustee to avoid and recover the gift to the brother under the Bankruptcy Code or applicable non-bankruptcy law. She chose not to.

the testimony that Debtor was attempting to divest himself of assets just prior to the bankruptcy

filing.

Conclusion Regarding
Intent as to False Oath Claims

Having analyzed all examples of non-disclosure in the Debtor's petition, schedules, and

SoFA, the Court does not find that the Debtor intended to hide assets from his creditors.  The

explanation is more likely that he did not give the forms his complete attention and that his

counsel did not serve him particularly well in this regard.  Ms. Bucher, counsel for the Debtor,

testified that the petition, schedules, and SoFA were prepared by her paralegal and herself.  Tr.

474. This involved sending out worksheets to the Debtor for him to complete and return. Tr. 474-

75.  The worksheets mirrored the petition, schedules, and SoFA.  Id.  Counsel would then send

back to him the petition, schedules, and SoFA and he would check its accuracy.  Tr. 475.

Counsel recalls "documents going back and forth." Id.  Counsel further testified that she did not

know if the Debtor reviewed the relevant documents on his own or with assitance. Tr. 476.  She

only knew that they "went over it either by email or by phone."  Tr. 476-77.

This inquiry matters given this Chapter 7 debtor's financial picture.  Unlike most such

debtors, the Debtor's personal balance sheet consisted of few debts but a fair number of assets.

His debts were overwhelming commercial, as opposed to consumer.[22]  In total, he has but five (5)

debts and of the five (5) only the obligation owed to Morgan Stanley is a consumer debt which

appears to have been satisfied.[23]  The remaining four (4) are business debts.  Three (3) of the four

---

[22] See Docket #4 Chapter 7 Statement of Your Current Monthly Income Form 122A-1 indicating that the Debtor has Primarily Non-Consumer Debts.

[23] It appears to relate to his brokerage account. This debt is listed on Schedule D in the amount of about $275,000 which appears to be a loan which in that amount which was secured by the funds in the brokerage account disclosed in  Schedule A/B under Item #18: "Investment accounts with brokerage firms." That asset is listed in the amount of $412,000. Morgan Stanley obtained relief from stay in order to liquidate enough funds in the account to satisfy the outstanding loan amount. See doc. #168.

(4) debts derive from the Debtor's guarantee of Wilton debt, while the last of the four (4) is described as a business debt. <u>See</u> Schedule E/F. That side of the Debtor's financial ledger is uncomplicated.

Not so with his assets. The Debtor owned a house in Pennsylvania and was about to relocate to Florida. The house in Florida was owned by a revocable trust. The revocable trust also owned two (2) adjoining parcels of real estate. On one (1) of the parcels the Debtor was operating a citrus farm. On the other he and his wife were renting out a mobile home to a third party. Yet reading the Petition, Schedules, and SoFA, one would know almost none of this. This is startling especially given that the fact that the same law firm which was advising the Debtor in this bankruptcy also assisted him in the estate plan which created the revocable trust. Counsel did not give the Debtor's case the attention that it required. But it is not accurate to say that this information was not revealed until trial: the Debtor was questioned about his tax returns and the farm property at his 341 meeting by interested parties in possession of that information. Pl. Exs. 5A, 58:2:13-60:8-16; 5B, 87:13-89:6. These assets were also included in financial statements given to third parties prior to bankruptcy. Def. Exs. D7-D9. So, while it would be a protracted process to determine what this Debtor did and did not own, the Trustee ultimately completed that process. For that reason, I find that the Debtor was not trying to hide what he owned.

<u>Materiality</u>

But more than motivation is necessary to prove culpability under this section of the Code. The infraction must matter to the underlying bankruptcy case. An omission is considered material under § 727(a)(4) when the subject "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or existence and disposition of property." <u>Hampton v. Young, (In re Young),</u> 576 B.R. 807, 814 (Bankr.E.D.Pa.

2017); see also In re Dawley, 312 B.R. 765, 784 (Bankr. E.D. Pa. 2004).  While an honest

mistake or oversight is not sufficient to deny a debtor his or her discharge, proof of actual harm

to creditors is unnecessary and the debtor cannot excuse the omission by claiming the property

not disclosed was of little or no value to the bankruptcy Trustee.  In re Spitko, 357 B.R. 272, 312

(Bankr.E.D.Pa. 2006).  Materiality may turn on the degree to which, if any, the misstatement (or

omission) impeded the proper administration of the bankruptcy case.  In re Mannion, 629 B.R.

783,787 (Bankr.E.D.Pa.2021).  A leading commentator explains that

> If the estate would have no interest in property that was omitted from a schedule, the
> omission is not material and should not be a ground for denying a discharge. Similarly,
> the omission of property of trivial value or property not subject to the claims of creditors
> has been treated as immaterial.
>
> In determining whether an omission is material, the issue is not merely the value of the
> omitted assets or whether the omission was detrimental to creditors. Even if the debtor
> can show that the assets were of little value or that a full and truthful answer would not
> have directly increased the estate assets, a discharge may be denied if the omission
> adversely affects the trustee's or creditors' ability to discover other assets or to fully
> investigate the debtor's pre-bankruptcy dealing and financial condition. Similarly, if the
> omission interferes with the possibility of a preference or fraudulent conveyance action
> the omission may be considered material. But a false statement that has no effect in the
> case is not grounds for denying a discharge.

6 Collier on Bankruptcy ¶ 727.04[1][b]

So even assuming wrongful intent on this Debtor's part, it is not clear that any of the

examples would be material as the term is understood. The omission which appears at least

arguably to be material is the cash gift to the Debtor's brother.  The timing is certainly

suspicious, and the amount is not insignificant.  Yet, for whatever reason, the Trustee chose not

to avoid and recover the transfer.  The omission has had no effect on the administration of the

case.  What she did pursue were the transfers to the Florida vendors which Plaintiff characterizes

as "insider" transfers.  Those vendors provided goods and services to the Debtor's citrus farm.

The Trustee sought to avoid and recover those payments as fraudulent transfers.  Her theory was

that the Debtor received no benefit in exchange for such payments because the goods and

services were rendered for the benefit of the Trust, and not the Debtor.  She filed nine (9) such

avoidance actions.  Four (4) resulted in default judgments.  Three (3) were dismissed.  And two

(2) settled for less than half of what was demanded.  But because there is no indication that any

of these suits were tried on their merits, I cannot ascribe any probative value from their legal

premise.

Relevance of Challenging
the Trust's Legitimacy

This question of materiality of those transfers that benefitted the Trust bears on another

point of this proceeding. Throughout the litigation, the Plaintiff maintains that the Trust is a

sham and must be disregarded.  Indeed, its Post-Trial Brief devotes seven (7) pages as to why

this so.  See Pl.'s Post-Trial Br. 3-9.  What has not been explained is the relevance of such a

determination.  As Plaintiff's counsel said in the opening statement at trial, "the first two

counts[24] are about disclosure, and disclosure in the bankruptcy petition and schedules." Tr. 16.

Asserting the abuse of a trust instrument does not appear to have anything to do with whether

Trust was disclosed or not.[25]  What matters is that while numerous things about the Trust went

undisclosed, it is unclear what appreciable effect this had on the administration of the case.

Count II – Denial of Discharge under 11 U.S.C. §727(a)(2)(A) and (B)

Whereas the first count is premised upon a debtor's omissions (i.e., failure to provide

information),  the second count deals with affirmative acts intended to hide assets.  Count II is

based on Code §727(a)(2)(A) and (B) which bars the entry of a discharge if:

---

[24] The count presently being address: Count I – nondisclosure under §727(a)(4).
[25] That would be the basis for an avoidance action or demand for turnover of property of the estate. The Bankruptcy Trustee would have standing to raise those claims as to the WSJ Trust, but she chose not to.  Her avoidance suit against the Debtor and his wife does not mention the Trust whatsoever.

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;[26]

11 U.S.C. §727(a)(2)(A) and (B).  This provision has two (2) core requirements: (1) "an act (*i.e.*, a transfer, removal, destruction, mutilation or a concealment of property) and (2) scienter (*i.e.*, a subjective intent to hinder, delay, or defraud a creditor). In re Burke, 523 B.R. 765, 769 (Bankr. E.D. Pa 2015).

Although paragraph (2) of section 727(a) includes both pre- and post-petition conduct,[27] the Plaintiff does not specify which conduct occurred before (or after) the bankruptcy was filed. Instead, he maintains that the Debtor engaged in concealment which may have preceded the one-year reach back period in subparagraph (A) but continued into the year prior to bankruptcy. Pl.'s Br. 13.  See Rosen v. Bezner, 996 F.2d 1527, 1532-33 (3d Cir. 1993) ("a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one-year period as long as the debtor allowed the property to remain concealed into the critical year.").  Such concealment, adds Plaintiff, may also continue into the post-petition period. Id.

It is not clear why the Plaintiff would couch *all* of the failures of disclosure as concealment. From the evidence, the Court identifies three (3) prepetition acts on the Debtor's part that appear to constitute transfers: the $10,000.00 gift to the Debtor's brother,[28] the sale of

---

[26] There is some functional similarity between concealment under §727(a)(2)(B) and §727(a)(4). Hiding an asset is no different from not disclosing it one's bankruptcy schedules. Both the requisite act and state of mind are elements of both offenses.

[27] Subparagraph (A) encompasses prepetition acts , while subparagraph (B) pertains to postpetition (bankruptcy estate) property.

[28] The check was dated June 27, 2016, which is less than one month prior to bankruptcy. Pl.'s Ex. 49

$20,000.00 worth of timber,[29] and the $200,000.00 in payments which Debtor made to various vendors which Plaintiff insists benefitted his Trust and not the Debtor.[30]  All three (3) are affirmative acts taken by the Debtor prepetition. By definition, then, the remaining non-disclosures occurred post-petition.  This point does not bear on the essential question, however, because the act requirement—be it the non-disclosure prepetition transfers of property or post-petition concealment of estate property—is not in dispute.  What *is* at issue is the Debtor's state of mind.

Intent and the
Prepetition Transfers

The state of mind required under §727(a)(2)(A) is actual fraudulent intent; constructive fraud is insufficient. E.g., In re Lybrook, 544 B.R. 537, 548 (Bankr. W.D. Pa. 2015); In re Hadad, 2008 WL 2156354, at *2 (Bankr. E.D. Pa. May 21, 2008).  Because a debtor is unlikely to admit that his or her actions were motivated by fraud, the plaintiff's evidentiary burden is eased by the court's ability to infer actual intent through circumstantial evidence or a course of conduct. Indeed, courts will consider certain types of factual circumstances, known as "badges of fraud," in determining whether it is appropriate to infer the existence of actual fraudulent intent.[31]

---

[29] The contract lacks a specific date but does indicate being signed in 2015 (Pl.'s Ex. 30) and so under the continuous concealment doctrine would constitute an act within the timeframe.  In addition, neither party has made an issue out of this fact.

[30] Some of these payments occurred within the year prior to bankruptcy while some are outside of it. See Pl.'s Exs 31A – 34B

[31] Courts have considered as many as eleven (11) circumstances as "badges of fraud:"
1. The transfer or obligation was to an insider.
2. The debtor retained possession or control of the property transferred after the transfer.
3. The transfer or obligation was disclosed or concealed.
4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
5. The transfer was of substantially all of the debtor's assets.
6. The debtor absconded.
7. The debtor removed or concealed assets.
8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

In determining whether the Debtor intended to hinder his creditors, I rely in part on the above discussion of the Debtor's state of mind.  Starting with the gift to his brother, I reiterate, *see supra* (discussion of failure to disclose gift to brother in context of "false oath") that while such a transfer appears questionable, the testimony does not support a finding that the failure to include the gift on the schedules was an attempt to hide money, but rather an oversight when reviewing the documents.  As to the sale of the timber, I have already found that the Debtor was not thinking of his creditors when he entered into that transaction.  And as to the $200,000.00 in payments which Plaintiff considers to be indirect transfers to an insider, the evidence does not support the contention that the Trust benefitted from this.

Intent and Postpetition Concealment

The postpetition conduct which might conceivably constitute intent to *conceal* would be the failures to disclose in the schedules, petition, and SoFA already considered.  This parallel is not surprising and a Bankruptcy Court in this District has recognized the practical similarly between making a false oath in a bankruptcy case under §727(a)(4)(A) and concealing an asset on the schedules under §727(a)(2)(B).  See In re Burke, 523 B.R. 765, 770 (Bankr. E.D. Pa. 2015).  That would mean that the same findings as to intent which this Court reached as to Count I would apply here. In other words, the record does not demonstrate that the Debtor intentionally concealed the assets and other information which he failed to disclose to his creditors.

---

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
10. The transfer occurred shortly before or shortly after a substantial debt was incurred.
11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
In re Glunk, 342 B.R. 717, 734 n.30 (Bankr. E.D. Pa. 2006) (citing In re Crater, 286 B.R. 758, 764 (Bankr. D. Ariz. 2002)).

Count V - 11 U.S.C. §523(a)(6)

That leaves Count V, the last count to survive summary judgment.  It is brought under

§523(a)(6) which excepts from discharge any "debt … for willful and malicious injury by the

debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6).  A debtor's

actions are willful and malicious under §523(a)(6) "if they either have a purpose of producing

injury or have a substantial certainty of producing injury." In re Conte, 33 F.3d 303, 307 (3d

Cir.1994).  "Willful" and "malicious" are distinct elements. E.g., In re Coley, 433 B.R. 476, 497

(Bankr. E.D. Pa. 2010).  Thus, to prevail the plaintiff must establish three (3) elements

demonstrating that the debt arose from an injury that was:

> (1) willful (i.e., involving deliberate and intentional conduct);
>
> (2) intended or substantially certain to cause injury; and
>
> (3) malicious (i.e., wrongful).

In re Didio, 607 B.R. 804, 817 (Bankr. E.D. Pa. 2019) (citations omitted).  The burden is on the

creditor to prove willful and malicious injury by a preponderance of the evidence.  Grogan v.

Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).


Plaintiff's Alternative Theories as
to Liability under 11 U.S.C. §523(a)(6)

In its Post-trial Brief, the Plaintiff does not direct the Court to the requisite evidence

needed to prove each of the three (3) elements.  Instead, the Plaintiff maintains that the record

demonstrates that the Debtor is guilty of two (2) separate and alternative causes of action which

constitute willful and malicious injury for purposes of subsection (a)(6).  The first cause of action

is based on Pennsylvania common law and the second on the Commonwealth's criminal code.

Plaintiff begins with the premise that a breach of a fiduciary duty is a willful and malicious

injury under §523(a)(6).  The Debtor was a fiduciary of Wilton and, by extension, its creditors

because the company had become insolvent. When deciding to liquidate Wilton, the Debtor

owed its creditors a duty to maximize its value. Yet the Debtor, says Plaintiff, declined the best

offer at hand and took, instead, a lower offer with the possibility of future personal gain. That

states, ostensibly, a breach of the Debtor's fiduciary duty which, in turn, constitutes willful and

malicious injury. Pl.'s Post-trial Br. 15.

More than mere self-dealing is the conduct which supports the Plaintiff's second theory.

The Plaintiff alleges that the Debtor effectively solicited a bribe from North Mill in agreeing to

undersell Wilton's inventory and receivables. His consent was conditioned on the right to share

in proceeds from the future sale of Wilton's real estate. This, says Plaintiff, is a crime under

Pennsylvania law or, at least at a minimum, an intentional tort. Pl.'s Post-trial Br. 16-18. And as

with its first argument, the Plaintiff maintains that this misconduct warrants an exception to

discharge. Id. at 16.

As to neither allegation, however, does the Plaintiff point to specific proof which satisfies

the requisite state of mind. This is curious given that two (2) of the three (3) elements of a

§523(a)(6) claim involve intent (i.e., willfulness and malice). And neither of the cases which

Plaintiff cites in its Brief stand for the blanket proposition that a violation of a fiduciary duty or

the commission of a certain crime (or intentional tort) constitutes a *per se* willful and malicious

injury. The case which held that a debtor who violated his fiduciary duty and thereby injured a

creditor specifically found that the debtor "knew or should have known that his actions would

have injured the plaintiff." In re Wissell, 494 B.R. 23, 41-42 (Bankr. E.D. N.Y. 2011). Likewise,

the case cited by Plaintiff which held that a debt arising out of the debtor's bribery conviction

would survive discharge was based upon specific findings by the district court judge that debtor

had misused his authority as sheriff to extort money from a shop owner and ultimately to plant

narcotics upon him and to have him unlawfully arrested and falsely imprisoned.  In re Nunley,

237 B.R. 907 (Bankr. N.D. Miss. 1999).  In both cases, the underlying conduct was proven to be

willful and malicious; here, the Plaintiff fails to provide guidance regarding the relevant evidence

in the record.

Threshold Question as
To Plaintiff's Injury

Before turning to a further analysis of whether the Plaintiff has supported its burden with

regard to the three (3) elements of this cause of action, it is helpful to consider the exact injury

that the Plaintiff complains of here.  The *debt* in question is the money owed for the unpaid

wares which the Plaintiff supplied to the Debtor's company (Wilton).  The Debtor personally

guaranteed that debt. After the company defaulted, the Plaintiff exercised its right of recourse as

to the Debtor.  The Debtor did not pay and, as a result, judgment was entered against him for

about $923,000.00.  These facts alone do not rise to the level of non-dischargeability.  There is

certainly injury sustained by the Plaintiff, but the foregoing does not suggest it was inflicted by

the Debtor willfully and maliciously.

But more *is* involved. The injury which the Plaintiff maintains it suffered is not just the

unpaid judgment amount: it is the lost opportunity to recover some (or all) of what is owed. That

opportunity was not realized, maintains Plaintiff, because of what the Debtor did.  According to

the Plaintiff, the Debtor undersold Wilton's non-real estate assets.  The highest bidder offered

$1.23 million to liquidate the company, but the Debtor declined that offer. Instead, he accepted a

bid of $750,000.00  Essentially, then, the Debtor failed to realize almost half of a million dollars

in declining the higher offer.

Willfulness

But, in order to offer evidence in support of a §523(a)(6) cause of action, that decision

must have been motivated by an intent to injure the Plaintiff.  In this context, the injury must

have been inflicted "willfully." The Supreme Court has clarified that

> [t]he word "willful" in (a)(6) modifies the word "injury," indicating that
> nondischargeability takes a deliberate or intentional injury, not merely a deliberate or
> intentional act that leads to injury... [T]he (a)(6) formulation triggers in the lawyer's mind
> the category "intentional torts," as distinguished from negligent or reckless torts.
> Intentional torts generally require that the actor intend "the consequences of an act," not
> simply "the act itself."

Kawaauhau v. Geiger, 523 U.S. 57, 61-62, 118 S.Ct. 974 (quoting Restatement (Second) of Torts

§ 8A, Comment a, p. 15 (1964)).  In the Third Circuit, "actions taken for the specific purpose of

causing an injury as well as actions that have a substantial certainty of producing injury are

'willful' within the meaning of § 523(a)(6)." In re Coley, 433 B.R. at 497 (citing In re Conte, 33

F.3d 303, 307-09 (3d Cir. 1994)).

In determining whether the Debtor intended to harm the Plaintiff by agreeing to liquidate

the inventory and receivables, the following central fact is instructive: the Plaintiff was not part

of the reason that the Debtor and North Mill chose Gordon Bros for the liquidation.  What was

the determinative factor in choosing a liquidator was the lender's increasing loan balance.  At

this time, operations at Wilton had effectively ceased (Tr. 377) but North Mill was still funding

current expenses in order to protect its collateral.  Tr. 333, 343, 377.  And other vendors had also

filed suit, albeit for lesser sums.  Pl.'s Ex. 95.  In February 2016, the liquidation process began in

earnest. It was then that the bids from liquidators were solicited.  So, it was at that point when

Debtor's intentions matter.  The lender appears to have been pressuring him to consent to the

only liquidation offer that did not have contingencies.  It rejected the Vagabond House offer of

$1.23 million because it was based on going concern value and Wilton was no longer operating.

Tr. 375.  That offer contained so many variables that it was not clear what the net proceeds

would be. Tr. 342-48.  The Gordon Bros offer ($700,000.00 to $750,000.00), on the other hand,

would be a lump sum without conditions.  And given that North Mill was funding Wilton's

current expenses, it needed to move fast to stop its growing losses.  Tr. 343, 377.  For that

reason, the creditor needed the Debtor to consent to the acceptance of the Gordon Bros offer so

that the personal property could be sold, and the proceeds applied to their outstanding debt.

North Mill, however, was unsure if the Debtor would cooperate.  Pl.s Ex. 77; Tr. 355.

So, it offered to share the proceeds from the sale of Wilton's real estate.  Tr. 358.  However, if

we assume that the Plaintiff is correct that Vagabond's offer would have ultimately yielded the

$1.23 million, then the Debtor should have pursued this offer.  He was Wilton's CEO.  He

therefore owed a duty to the company and, by extension, its creditors once Wilton was insolvent.

Instead, the Debtor accepted an offer that was better for him personally, but worse for Wilton.

That would appear to be a breach of duty.

Yet even if this is so, nothing in the record suggests that the Debtor made this decision

with animus towards the Plaintiff or any other creditor.  What the evidence shows is that the

Plaintiff is mentioned in a January 18-19, 2016, email chain. Pl.'s Ex. 63.  There, the lender asks

about the Plaintiff's lawsuit and is informed that it is pressing for judgment.  But from February

5 to March 7, 2016, what is discussed among the Debtor, his counsel, Wilton's turnaround

manager, North Mill's representatives, and the potential liquidators is the liquidation of the

Wilton inventory and receivables and how to get the Debtor to cooperate in that process.

Nothing in the Debtor's communications indicates that he was thinking of the Plaintiff when this

decision was made.

<u>Was there Intent to Injure or Was</u>
<u>Injury Substantially Certain to Result</u>

If the record does not demonstrate that the Debtor even considered the Plaintiff during the runup to liquidation, it is hard to see how he might have intended to harm AHR. Similarly, given that the lender discounted the $1.23 million liquidation offer because of its contingencies, it does not appear that the Debtor had to know that Plaintiff would be harmed by that choice.

<u>Malice</u>

Nor would that decision indicate that Debtor acted with malice. One Bankruptcy Court from this district has described the malice element to require "conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional "aggravated circumstances."" <u>In re Jacobs</u>, 381 B.R. 128, 139 (Bankr.E.D.Pa. 2008) (quoting <u>In re Long</u>, 774 F.2d 875, 881 (8th Cir. 1985)).

This quotation encapsulates why the Debtor's conduct as it affected the Plaintiff does not rise to the requisite level. While he was certainly wrong to improve his position at the expense of his fiduciary obligation to creditors, that is not more than "reckless disregard" as to the rights of the creditors.  Again, any intent was **not** directed towards the Plaintiff.  While such conduct may be actionable, the Plaintiff has failed to show that the infraction meets the high standard for a determination of nondischargeability.

<u>Evidence of Extent</u>
<u>of Purported Injury</u>

Lastly, even if the Plaintiff had established the three (3) elements of this cause of action, it is not clear how much, if any, loss was sustained.  Assuming for the sake of argument that the Debtor accepted the $1.23 million offer, and that sum was realized upon liquidation, the question becomes how might that have positively affected the Plaintiff's recovery?  Both North Mill and

the Debtor were consensual lien creditors. North Mill was owed $1 million on its first lien Pl.'s

Ex.77 and next came the Debtor who was owed $250,000.00 under the JPA. Pl.'s Ex. 48A.

Because those two (2) consensual liens slightly exceed the $1.23 million offer the Plaintiff would

have recovered nothing from the liquidation.  That left Wilton's real estate which was sold in the

bankruptcy case for approximately $800,000.00.  Pl.'s Ex. 105.  As a judgment creditor of

Wilton, the Plaintiff would have an interest in the proceeds from that sale.  Indeed, there was

testimony that Plaintiff has already received $150,000.00 from that sale; that the Wilton Trustee

is holding $400,000.00 in that estate; and that Plaintiff is its only secured creditor.  Tr. 419-21.

But the Wilton Trustee (Mr. Eisenberg) did not testify.  Without the relevant information, I

cannot determine the extent of damages.

<u>Summary</u>

  I will enter judgment in favor of Debtor/Defendant and against the Plaintiff on all three

counts.  As to Count I, while there were numerous failures to disclose assets and other financial

information, there is no indication that this was done with intent to deceive.  That same finding

supports a ruling in Debtor/Defendant's favor as to Count II.  Next, the evidence does not

support the claim in Count V that the Debtor/Defendant undersold his company's inventory or

that even if he did, such decision was made with the purpose of harming the Plaintiff.

  An appropriate order follows.

Dated:   **June 8, 2023**

Patricia M. Mayer
United States Bankruptcy Judge